**From:** Michael Boyd [mailto:michaelboyd@sbcglobal.net]
**Sent:** Monday, June 14, 2010 7:15 PM
**To:** Tracy_Forakis@cand.uscourts.gov
**Cc:** Deborah Behles; Helen Kang; Sarveybob@aol.com; VACATIONPOMBO@aol.com; ANDREW III; Shana Lazerow; Martin Homec; Fisherow, Benjamin (ENRD); rob@redwoodrob.com; ENRD, PUBCOMMENT-EES (ENRD); Miles Muhammad; Minister Christopher; Franzo King; Francisco Da Costa; Lynne Brown; Leon Muhammad; Barry Minkow
**Subject:** Case No. 3:09-cv-04503-SI: CARE comments on Motion on Revised Consent Agreement before the United States District Court Northern California District, in United States v. PG&E

--- On **Tue, 5/25/10, Tracy_Forakis@cand.uscourts.gov** <*Tracy_Forakis@cand.uscourts.gov*> wrote:

From: Tracy_Forakis@cand.uscourts.gov <Tracy_Forakis@cand.uscourts.gov>
Subject: Re: Case No. 3:09-cv-04503-SI: Request for Permission to file comments on Motion on Revised Consent Agreement before the United States District Court Northern California District, in United States v. PG&E
To: "Michael Boyd" <michaelboyd@sbcglobal.net>
Date: Tuesday, May 25, 2010, 2:39 PM

I am not sure when objections would be filed. You need to review the filings or call counsel.

**Michael Boyd <michaelboyd@sbcglobal.net>**

05/25/2010 02:39 PM

To Tracy_Forakis@cand.uscourts.gov
cc
Subject Re: Case No. 3:09-cv-04503-SI: Request for Permission to file comments on Motion on Revised Consent Agreement before the United States District Court Northern California District, in United States v. PG&E

Tracy,

Is there some sort of briefing schedule or deadline for the comments to be considered? Please advise.

Mike Boyd-CARE

--- On **Tue, 5/25/10, Tracy_Forakis@cand.uscourts.gov** <*Tracy_Forakis@cand.uscourts.gov*> wrote:

From: Tracy_Forakis@cand.uscourts.gov <Tracy_Forakis@cand.uscourts.gov>
Subject: Re: Case No. 3:09-cv-04503-SI: Request for Permission to file comments on Motion on Revised Consent Agreement before the United States District Court Northern California District, in United States v. PG&E
To: "Michael Boyd" <michaelboyd@sbcglobal.net>
Date: Tuesday, May 25, 2010, 2:27 PM

hmm... I would say just send them in and we will file what ever we receive.

**Michael Boyd**
**<michaelboyd@sbcglobal.net>**

05/25/2010 02:25 PM

To tracy_forakis@cand.uscourts.gov

cc

Subject Case No. 3:09-cv-04503-SI: Request for Permission to file comments on Motion on Revised Consent Agreement before the United States District Court Northern California District, in United States v. PG&E

Dear Tracy Forakis,

Regarding Case No. 3:09-cv-04503-SI, I would like to request permission to file comments on the United State's Motion on Revised Consent Agreement before the United States District Court Northern California District, in *United States v. PG&E*, Case No. 3:09-cv-04503-SI.

Respectfully,

Michael E. Boyd President

CAlifornians for Renewable Energy, Inc. (CARE)

5439 Soquel Drive

Soquel, CA 95073

Phone: (408) 891-9677

E-mail: michaelboyd@sbcglobal.net

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>and<br><br>COMMUNITIES FOR A BETTER ENVIRONMENT,<br>Intervenor-Plaintiff,<br><br>V.<br><br>PACIFIC GAS and ELECTRIC COMPANY,<br>Defendant. | Civil Action No. 09-4503 SI<br><br>CARE COMMENTS ON UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO ENTER AMENDED CONSENT DECREE |

**TABLE OF CONTENTS**


TABLE OF CONTENTS ....................1

I. INTRODUCTION ....................2

II. ARGUMENTS ....................14

III. THE CULTURE OF SYNERGISTIC CORRUPTION ....................17

IV. WHAT IS SYNERGISTIC CORRUPTION? ....................18

V. REPLY TO UNITED STATES MOTION ....................19

A. Nitrogen Oxides (NOx) ....................22

B. Ground Level Ozone (smog) ....................22

C. Carbon Monoxide (CO) ....................23

D. Particulate Matter (PM) ....................23

E. Carbon Dioxide (CO2) ....................23

VI. 42 U.S.C. § 1983 ....................24

VII. CONFUSION OR SYNERGISTIC CORRUPTION? ....................24

VIII. CONCLUSIONS ....................26

## I. INTRODUCTION

In behalf of CAlifornians for Renewable Energy, Inc. (CARE) we provide the following comments in response to the *United States' Memorandum in Support of Motion to Enter Amended Consent Decree* before the United States District Court Northern California District, in *United States v. PG&E*, case No. 3:09-cv-04503-SI [1] We allege that there is a pattern and practice of the United States participating in synergistic corruption with the energy industry.



**Revelation 13:1-10: And I stood upon the sand of the sea, and saw a beast rise up out of the sea, having seven heads and ten horns, and upon his horns ten crowns, and upon his heads the name of blasphemy.**

This case concerns the Gateway Generating Station, a natural-gas-fired electric power plant located near Antioch, California. In its Complaint, the United States alleged that PG&E constructed the Gateway Station and has operated it in continued violation of the New Source Review provisions of the Clean Air Act ("Act"). *(See* 42 *U.S.C.* § 7475.) In August 2009 the Environmental Protection Agency ("EP A") notified PG&E that EPA believed the company had violated the Act. Negotiations ensued and a settlement of the alleged violations was agreed to without the need for litigation. That settlement is embodied in the proposed Consent Decree that was lodged with the Court at the same time the United States filed its Complaint, as amended by the Amended Consent Decree.

In sum, the claims in this case turn on whether the 2001 New Source Review pre-construction permit authorizing the construction of the Gateway Generating Station expired

[1] See US EPA *Responses to Comments Regarding Consent Decree for Gateway Generating Station* and *United State's Memorandum in Support of Motion to Enter Consent Decree – Civil Action No. 09-0453 SI.*

before PG&E constructed the plant and started operating it. Answering the question requires a review of the federal and local regulations that govern the expiration of permits - they are dependent on an integrated approach of federal and local authority to administer the New Source Review program in the San Francisco Bay Area. Moreover, assessing PG&E' s liability and the scope of relief that may be appropriate in this case also must recognize that PG&E acquired the facility before it was built from another company, Mirant Delta; LLC, that had obtained the pre-construction permit in 2001, started construction only to discontinue it, and conveyed the facility (and its permit) to PG&E in late 2006. By that time, the United States maintains, the permit had already expired, but the history of conduct by all the regulatory agencies involved -local, state, and federal - is one of synergistic corruption with both Mirant and PG&E.

> As noted above, the Court must consider a number of factors in determining whether a proposed consent decree is substantively fair. In the end, the process results in "an amalgam of delicate balancing, gross approximations and rough justice." *(Officers for Justice,* 688 F.2d at 625 (citations and internal quotations omitted).) The United States maintains this settlement is substantively fair because it results in the same environmental benefit that a new PSD permit would because it secures a meaningful mitigation project that actually increases the environmental benefit beyond what a new PSD permit would require. The amount of the civil penalty is a sore point with the citizens, but, as the United States explains in the next Section, it is justified by the unusually confused factual history of this case and by the United States' decision to spend its "settlement capital" securing more expansive environmental benefits through the mitigation project instead of attempting to obtain a higher civil penalty. For their part, the citizens maintain the Decree is unfair because PG&E is clearly liable and because the Decree fails to require a new PSD permit; imposes emission limits that are not equivalent to BACT; and fails to secure a sufficient civil penalty to level the playing field with PG&E's competitors and deter other companies from similar behavior. [Motion p. 24 at 22 to 28 and p. 25 at 1 to 8]

Irrespective the United States decided in view of the minimal risks that fully litigating this case would entail, the United States and PG&E agreed to a settlement that purports to reduce and restrict the emissions of only two major pollutants emitted by gas-fired power plants such as Gateway - oxides of nitrogen ("NOx") and carbon monoxide ("CO") - to levels that EPA has inappropriately determined are BACT in light of the requirements of the law and the terms of other recently issued permits. The levels adopted by this settlement failed to comport with current BACT requirements for CO, and for Particulate Matter of 10μm and 2.5μm diameter or less. A specific example of this is United States proposed a BACT limit of 4 ppm for CO when a BACT limit of 2 ppm is approved in practice already within the BAAQMD. The Settlement fails

to require PG&E to cease and desist operating the Gateway Generating Station without a PSD permit and therefore effectively exempts the plant from the requirement for a PSD permit altogether. The United States synergistic corrupt purpose with PG&E in this regard is to preclude the public from meaningful and informed participation on the PSD permit and to allow PG&E to avoid current BACT requirements for the plant to operate lawfully in compliance with the Clean Air Act ("CAA"). The settlement also is for a insignificant $20,000 civil penalty, and it requires PG&E to purportedy implement a project[2] designed to mitigate the alleged adverse impacts of its higher emissions that doesn't address current BACT requirements as more effective emission control technology like SCONOx[3] is available, also approved in practice, which the United States refused to even consider alternative emission control technologies that are more effective.

Your Honor we sincerely appreciate your providing us an opportunity for meaningful and informed public participation on the US EPA *Responses to Comments Regarding Consent Decree for Gateway Generating Station* and *United State's Memorandum in Support of Motion to Enter Consent Decree – Civil Action No. 09-0453 SI* referred to herein as the *Motion*.

CAlifornians for Renewable Energy, Inc. (CARE) is a small under funded non-profit corporation under Section 501(c) (3) of the federal tax code, Taxpayer ID No. 77-0542998. We have members throughout the United States with most members residing in California. CARE has two volunteer unpaid attorneys who are representing CARE, Mr. Martin Homec of Davis and Mr. Stephen C. Volker of Oakland California. Either attorney is willing to represent us in a hearing before your Honor. CARE's volunteer Board of Directors including Michael Boyd of Soquel, CARE's President, Mr. Lynne Brown of the Bay View Hunters Point community in San Francisco, CARE's Vice-President. Rob Simpson who is a member of CARE won a Remand Order at US EPA EAB causing BAAQMD to reissue the PSD permit for Russell City.

> "Robert Simpson submitted comments critical of the proposed Decree because it failed to redress PG&E's failure to complete the permit amendment process in 2007. (App. A5 Att. 114 Simpson Comments). The United States has responded to the question of PG&E's liability arising out of the 2007 petition to amend. Mr. Simpson also maintains that the EPA public comment provisions in 40 C.F.R. § 124.10(c) (1) (iv) have not been complied with in this settlement, and that this proposed Decree should comply with those procedures (App. AS Att. 1 at 1-2).

---

[2] On May 7, 2010, the United States and PG&E filed a joint stipulation seeking leave to file under seal information establishing the cost of the mitigation project PG&E was required to implement under the proposed Decree.
[3] See http://www.emerachem.com/papers/SCONOx%20White%20Paper%20-%20r1.pdf

> The United States responds that 40 C.F.R. § 124 imposes obligations on EPA explicitly with respect to the public comment process in EPA "permit" proceedings under the Resource Conservation and Recovery Act, the Underground Injection Control provisions of the Safe Drinking Water Act, the *Prevention of Significant Deterioration Provisions of the Act*, and the National Pollutant Discharge Emission System of the Clean Water Act. (See 40 C.F.R. § 124.1.) *This is not such a permitting proceeding.* The obligations imposed by Part 124 do not govern judicial enforcement proceedings such as this one. Here, public comment was sought pursuant to Department of Justice regulations, 28 C.F.R. § 50.7, which apply to the settlement of judicial matters in which the United States Department of Justice seeks to enjoin the discharge of pollutants. The United States has fully complied with that regulation. *Mr. Simpson makes several additional comments concerning "how California power plant operators violate the Clean Air Act," and how there is a "systemic failure" in California to properly involve the public in decision-making about new power plants* (App. AS Att. 1 at 2-4), but none of those comments relate further to the alleged violations in this cue or the proposed Decree. [Motion p. 37 at 12 to 28 and p. 38 at 1 to 3]] [*Emphasis* added]

These statements by the United States responding to Mr. Simpson's comment are clearly erroneous since the enforcement action before you against Defendant PG&E is for operating its Gateway facility without a PSD permit.

Mr. Jim MacDonald of Pittsburg is CARE's Secretary and he lives within a mile of the Gateway facility, while Mr. Sarvey is also a member of CARE and CARE's Treasurer, he lives downwind of the project in Tracy which is subject to a 70% transport factor of the emissions from the plant in the BAAQMD in to the San Joaquin Valley Air Pollution Control District.

> Robert Sarvey submitted comments critical of the settlement. (App. A3 Att. l-Sarvey Comments). He believes, first, that *PG&E is not "blameless" in this matter and offers an email exchange purporting to demonstrate that PG&E knew it needed a new PSD permit in 2007. (Id.* At 1-2 (referring to the meeting notes at Appendix B23 forwarded in the email exchange.) The United States has addressed PG&E's potential liability arising out of the design changes contemplated in its 2007 petition at pages 19 to 20, *supra.* Mr. Sarvey maintains that the facility should be shut down until a permit is issued. *(Id.* at 3). The United States has explained why it has not required the facility to obtain a new permit as part of the proposed Decree *(see* pages 26 to 27, *supra).* Mr. Sarvey states that the proposed Decree does not impose sufficiently stringent emission limits for carbon monoxide and particulate matter. (App. A3 Att. 1 at 3-5.) EPA has addressed this concern at App. C at pp. 12-15. Mr. Sarvey also states that OPFLEX is less "effective than other packages available to limit startups and shutdowns, and he implies that OPFLEX is BACT. (App. A3 Att. 1 at 5-6). EPA has explained the status of the OPFLEX programs as an appropriate mitigation project at App. C at pp. 18-19. Finally, Mr. Sarvey states that the civil penalty is inadequate. (App. A3

Att. 1 at 5-6.) The United States has responded to this concern at pages 29 to 32, *supra*.

OPFLEX is not mitigation but a necessary requirement to meet current BACT requirements.

On September 8, 2009, CARE filed a complaint[4] requesting that the Federal Energy Regulatory Commission ("FERC" or "Commission") impose civil penalties on PG&E under the Federal Power Act (FPA) for operating the Gateway Generating Station without a permit required under the Clean Air Act. CARE's complaint argues before FERC that PG&E's operation of the Gateway Generating Station without required permits violates section 4A of the Natural Gas Act (NGA) and sections 31(a) and 222 of the FPA, as well as the Commission's rules in its request for rehearing of December 19, 2009.[5] CARE's complaint included an attached August 4, 2008 e-mail[6] from the Bay Area Air Quality Management District ("BAAQMD")'s attorney that stated "Sandy Crockett provided a summary of the [USEPA Environmental Appeals Board] EAB decision on the Russell City Energy Center [RCEC] PSD permit amendment and the timing implications of at EAB appeal for GGS. District was taken to task by EAB for not complying with noticing requirements of 40 CFR 124 and is concerned that the notice provided for the GGS amendment might also be viewed by EAB as deficient. Sandy is concerned that the EAB plaintiff in the RCEC case would appeal the GGS permit to the EAB on the same grounds. He indicated that the RCEC plaintiff [who is a CARE member] had been in contact with [CARE member] Bob Sarvey, who had submitted public comments on the GGS draft permit. He noted that power plant project opponents such as Sarvey appear to have discovered that the EAB appeal process is an effective means of delaying projects since an EAB appeal stays the PSD permit for 6 months or more even if EAB ultimately rejects the appeal…. Gary noted that under EPA policy, once a facility starts up, a non-major amendment no longer requires PSD review and public notice, so if amendment issuance were to be delayed until after startup the PSD issues could be moot. However, District would appear to be circumventing the regulatory process if it

---

[4] See FERC Docket EL09-73 *et al*. See http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=12137577

[5] See http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=12172687

[6] Please mark this as a separate exhibit See http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=12140873 Submittal 20090928-5082 at pages 3 and 4.

were to delay. If GGS were to withdraw permit amendment until after commissioning it would be hard for District staff to support, and the Hearing Board to grant, a variance."

This August 4, 2008 e-mail demonstrates a clear practice of synergistic corruption by the United States with PG&E. Since CARE's FERC complaint is currently pending rehearing at the FERC we request your Honor investigate why the United States does not support CARE's complaint and pursue both criminal and civil remedies from PG&E to maximum extent the law allows.

Since the BAAQMD at that time and currently has a delegation agreement with USEPA for PSD permits for facilities such as GGS CARE believes this delegation agreement should be rescinded by the court setting a precedent that affects all other air districts in the State of California along with an enforcement order for compliance with 40 C.F.R. § 124.10 by US EPA going forward.

CEC should also be bared by the court from any say over this or other power plants or transmission projects with Federal permitting requirements; particularly any notice for public comment hearing or participation on any Federal permits since no statutory authority exists to allow CEC to do so and as CEC has demonstrate a propensity in this case to aid and abet PG&E's noncompliance.

On August 12, 2009 the United States Environmental Protection Agency ("USEPA") issued its "Finding and Notice of Violation" ("FNOV") regarding the PSD permit for the project or lack thereof.14 On September 24, 2009 the United States Department of Justice ("USDOJ") lodged a "Consent Decree" before the US District Court for the Northern District of California.

We are all willing to testify that we have experienced intimidation, threats, harassment, and retaliation from the United States in regards to the Gateway conspiracy, the Lennar conspiracy, the Russell City conspiracy, and many more conspiracies by the United States for attempting to exercise our lawful rights to public participation on energy projects. We provide these pictures with quotes from scripture to show the current juxtaposition of the depth of our concern from the harm that results from not requiring environmental protection permits for new construction. We all would like an opportunity to appear before you in this matter. We don't want to go where we are not invited and since our attorneys like us are overworked and underpaid volunteers we haven't instructed our attorneys to intervene.

According to the United States' *Motion* "C[A]lifornians for Renewable Energy ("CARE") commented that EPA (either through its own actions or through the actions of BAAQMD) engaged in a criminal conspiracy [Conspiracy A] with PG&E to knowingly violate the Act, in part, in retaliation against CARE for its prior actions. (App. A8-CARE Comments at 3,) At pages 4 to 13 of its comment, CARE recites the history of this matter and accuses EPA of complicity in PG&E's violation. However, *the only misconduct of which CARE appears to accuse EPA of engaging in is entering into this settlement*. [Motion p. 36 at 8 to 13] [ *Emphasis* added] This is in error the misconduct EPA is participating in is synergistic corruption with PG&E to violate the Clean Air Act.



**Revelation 16:3: The second poured out his phial upon the sea - As opposed to the dry land. And it become blood, as of a dead man - Thick, congealed, and putrid. And every living soul - Men, beasts, and fishes, whether on or in the sea, died.**

"At pages 13 to 28, the CARE comment deals with another alleged conspiracy [B] by *EPA and BAAQMD, in concert with the City of San Francisco, the San Francisco Redevelopment Agency, and Lennar (a construction company). That alleged conspiracy concerns EPA's supposed mishandling of toxic dust containing asbestos disturbed as a result of demolition activities in the Bay View Hunters Point district in San Francisco. Those allegations are completely irrelevant to the instant proceeding, and* <u>*the United States will not respond.*</u> [We request your Honor at a minimum order United States to do so.] The CARE comment criticizes the proposed Decree because it fails to impose limits on greenhouse gases emitted from the Gateway Station (App. A8-CARE Comments at pages 30 to 37.) EPA has responded to this

aspect of the CARE comment (App. C at p. 20). In all other respects, the CARE comment adopts the comments of others. "[Motion p. 36 at 13 to 23] [*Emphasis* added]

We dispute United States appropriately responded to our comments and ask your Honor to grant us appropriate relief requested herein.

Regarding the Lennar conspiracy with the United States, respectfully, this matter isn't "completely irrelevant" since we are asking for an opportunity to make a showing that there is a similar pattern and practice of synergistic corruption between the United States in concert with the City of San Francisco, the San Francisco Redevelopment Agency, and Lennar (a construction company) as with the Gateway project being allowed to operate by PG&E without a permit.

On January 7, 2009, Barry Minkow and the Fraud Discovery Institute issued their initial report on Lennar Corporation, citing 10 Red Flags of Fraud. As of January 28, 2009 (only 21 days later), there was definitive proof that four of the red flags were true. Included are a comparison of the items from the original FDI report, the initial denials by Lennar, the later admissions by Lennar, and the opinion of an independent expert. The result? No FDI allegations have been proven false. FDI also predicted that Lennar would sue Barry Minkow and the company in an attempt to intimidate them, and that prediction has been proven true as well.[7]

Barry Minkow is an expert witness on fraud willing to testify before your Honor in this case to make a showing that there is a similar pattern and practice of synergistic corruption between the United States in concert with the City of San Francisco, the San Francisco Redevelopment Agency, and Lennar. The trailer to the movie Too Big to Go to Jail - The Lennar Story Movie Trailer[8] http://www.2big2go2jail.com/quicktime.html and the bonus trailer http://www.2big2go2jail.com/bonusquicktime.html - describes alleged falsification of government document by Lennar.

Your Honor the impacted residents of Bay View Hunters Point San Francisco also have requested we ask you for an opportunity to provide written sworn declarations to substantiate CARE's claims; since we are asking for an opportunity to make a showing that there is a similar pattern and practice of synergistic corruption between the United States in concert with the City of San Francisco, the San Francisco Redevelopment Agency, and Lennar as with the Gateway

---

[7] See http://www.lenn-ron.com/docs/confirmed.pdf

[8] Mr. Boyd CARE's President is shown near the end of the trailer describing Lennar as a "law suit mill".

project being allowed to operate by PG&E without a permit. Please provide procedural guidance on the deadline to do this if our request is granted.

Even Barry Minkow is the subject of harassment and intimidation by the United States for fighting Lennar's fraudulent actions as reported in the June 11, 2010 Dow Jones Newswires article *SEC Probe Into Barry Minkow's Fraud Discovery Institute Continues* "The SEC in January sent subpoenas to Minkow, FDI and other parties thought to have ties to Minkow and his firm. Minkow said he is the target of the investigation, though the SEC doesn't make this clear in communications accompanying the subpoenas…The SEC states the "investigation is a non-public, fact-finding inquiry," intended "to determine whether there have been any violations of the federal securities laws," according to copies of three of the subpoenas and related materials reviewed by Dow Jones Newswires…An SEC spokesman declined to discuss the matter. In the subpoenas, the SEC says the investigation, titled "In the Matter of Fraud Discovery Institute," doesn't mean that it has concluded that the subpoena recipients "or anyone else" has broken the law, nor does it mean that the agency has a "negative opinion of any person, entity or security."…*Minkow has been a vocal critic of several public companies*, and has issued scathing reports on the FDI website that have prompted some target companies to both sue Minkow and press the SEC to investigate him. These companies claim Minkow spreads false information to harm the price of their shares, which enriches Minkow and his cohorts via short positions they place in hopes that the securities fall in value."

We allege that there is a pattern and practice of the United States participating in synergistic corruption with the energy industry as demonstrated by the United States miss-handling of the Gulf Oil Spill, as reported by the May 14, 2010[9] New York Times article *U.S. Said to Allow Drilling Without Needed Permits*. "WASHINGTON — The federal Minerals Management Service gave permission to BP and dozens of other oil companies to drill in the Gulf of Mexico without first getting required permits from another agency that assesses threats to endangered species — and despite strong warnings from that agency about the impact the drilling was likely to have on the gulf…Those approvals, federal records show, include one for the well drilled by the Deepwater Horizon rig, which exploded on April 20, killing 11 workers

[9] The *United States' Memorandum in Support of Motion to Enter Amended Consent Decree - Civil Action No. 09-4503 SI* is signed May 13, 2010.

and resulting in thousands of barrels of oil spilling into the gulf each day." And this is by the same federal government workers who the San Francisco Chronicle in an article titled *Offshore drilling regulator to be broken up* reported on May 12, 2010 "Even before the gulf spill, the agency had been battered by the findings of a 2008 Interior Department *investigation* that *revealed employees* in its Denver office had *inappropriate sexual relationships with representatives of oil companies and had used drugs*." [10]

There is substantial evidence of synergistic corruption based on the United States' **pre-spill** behavior. Most incriminating were the episodes described by this *Washington Post* article[11] from May, in which the Interior Department "exempted BP's calamitous Gulf of Mexico drilling operation from a detailed environmental impact analysis." Specifically, "the department's Minerals Management Service (MMS) [gave] BP's lease at Deepwater Horizon a 'categorical exclusion' from the National Environmental Policy Act (NEPA) on April 6, 2009."

For any government approval given to projects that could significantly impact the environment, NEPA generally requires[12] that the relevant agency assess "the environmental impact of the proposed action," and it specifically requires[13] for oil exploration projects that the Interior Department review the proposed project for, among other things, its environmental impact. It was those legal requirements for which MMS issued an exemption for the BP Deepwater Horizon project.

The Obama White House clearly recognizes how damaging this exemption story could be, because the President, unprompted, raised that issue several times in his Press Conference held on May 27, 2010.[14] This is the explanation he gave as to why his Interior Department issued those exemptions to BP:

---

[10] What makes all of this particularly egregious in the BP case is how predictable it was. An Interior Department review itself found in 2008 that MMS was "a dysfunctional organization that has been riddled with conflicts of interest, unprofessional behavior and a free-for-all atmosphere for much of the Bush administration's watch," findings which "provoked immediate outrage in Congress." It was long known that the Interior Department, for at least the last decade, was nothing but a rubber stamp for the oil industry.
See http://www.nytimes.com/2008/09/11/washington/11royalty.html

[11] See http://www.washingtonpost.com/wp-dyn/content/article/2010/05/04/AR2010050404118.html

[12] See http://www.law.cornell.edu/uscode/42/usc_sec_42_00004332----000-.html

[13] See http://vlex.com/vid/geological-geophysical-explorations-19255930

[14] See http://blogs.suntimes.com/sweet/2010/05/obama_on_bp_oil_spill_im_fully.html

> [T]here is a thorough environmental review as to whether a certain portion of the Gulf should be leased or not. . . . .Under current law, the Interior Department has only 30 days to review an exploration plan submitted by an oil company. **That leaves no time for the appropriate environmental review. The result is, they're continually waived.** And this is just one example of a law that was tailored by the industry to serve their needs instead of the publics.

It seems highly unlikely that Congress -- which is not exactly notorious for imposing excessively rigorous regulations on the oil industry -- would enact a statutory requirement which, self-evidently, would be too rigorous to meet. But even if that were true -- even if Congress really did impose an impossible-to-meet 30-day period for conducting environmental reviews -- why didn't the Obama administration, whose party controls the Congress, ever ask that the law be amended to provide as much time as is needed to complete the review? Or why didn't Interior officials tell the oil industry that they would refuse to issue these permits until the industry had their lobbyists instruct Congress to change the law to allow for a more reasonable timeframe? Instead, faced with a supposedly impossible-to-meet statutory requirement of conducting environmental reviews, the Interior Department just threw its hands up and circumvented the law by oh-so-reluctantly and helplessly handing out exemptions like candy to any oil company that asked? Is that at all believable?

Even if that 30-day excuse were true, it reflects very poorly on the United States. But as *The Washington Post*, noted on June 2, 2010[15] that excuse is false. An appellate court in 2008 rejected the 30-day interpretation now being asserted by United States. That 9th Circuit ruling, in the case of *Alaska Wilderness League, et al. v. Kempthorne*[16], is really quite instructive to read, both because it illustrates how false is the excuse of Obama officials and, more generally, because of what it reveals about a pattern of practice of synergistic corruption between MMS regulators with the oil industry. In that case, numerous environmental groups sued in order to challenge the Bush Interior Department's approval of a Shell Oil plan to drill multiple offshore exploratory oil wells over a three-year period in the Alaskan Beaufort Sea.

This is what happens frequently: environmental groups have to sue in order to prevent the United States and the oil industry from working jointly to circumvent Congressional

---

[15] See http://www.washingtonpost.com/wp-dyn/content/article/2010/05/31/AR2010053103126.html?hpid=topnews

regulations for drilling projects. Just as was true for the BP Deepwater Horizon project, MMS in the Shell case had issued an exemption from the legal requirement that an environmental impact study be conducted before the drilling project could be approved, notwithstanding numerous, serious concerns raised even by Bush Interior Department officials about the impact of the Shell project.

The excuse the Bush administration gave for failing to conduct that review is the same one Obama gave in his press conference. As the court put it: "MMS argues that the strict timelines in OCSLA indicate that an EIS is not a feasible option at the exploration stage. The agency only has thirty days to approve or disapprove of an exploration plan" and officials "argue that **thirty days is not enough time to generate a full EIS**." The court categorically rejected that excuse (emphasis added):

> The agency may be correct that it is difficult for an agency to conduct a full EIS in only thirty days, but its argument that OCSLA precludes such a result is unconvincing. **There is flexibility built into the regulatory scheme** so that the agency can perform its full duties under NEPA. The thirty-day clock begins to run only when an exploration plan is deemed complete. 30 C.F.R. § 250.233(a). If the agency is able to identify gaps before that point, then it can request that information be added before the proposal is finalized. See 30 C.F.R. § 250.231(b). Additionally, at the end of the thirty-day review period, the agency may opt to require modifications to an EP if there are concerns that it does not comport with environmental standards. 30 C.F.R. § 250.233(b). **These options give the agency additional time to consider a plan and compile an environmental impact statement, if necessary. To say simply that the agency only has thirty days to complete a full EIS is misleading.**

The excuse which the court condemned as "***misleading***" is exactly the one Obama and his aides have been repeatedly making for why they issued exemptions to BP: namely that, as the President put it, "under current law, the Interior Department has only 30 days to review an exploration plan submitted by an oil company. That leaves no time for the appropriate environmental review." As a result, the court found that MMS's approval of Shell's drilling plan (including the exemptions it issued) violated NEPA, and thus invalidated the approval and ordered MMS to re-review the proposal in compliance with the law. That decision was issued in November, 2008 -- before the Obama administration even began -- so the notion that Obama

---

Continued from the previous page

[16] See http://www.morelaw.com/verdicts/case.asp?d=38052&n=07-71457&s=AK

Interior officials believed they only had 30 days to conduct a review, and that it therefore was **forced** to issue exemptions to BP, lacks credibility, to put that mildly.

Had MMS complied with the law and conducted an EIS on the BP project, would that have prevented the spill? It's impossible to say. But the broader point illustrated by this is the important one: the extent to which the United States continues to be beholden to, controlled by, the industries it ostensibly regulates, and the extent that this demonstrates a pattern and practice of synergistic corruption by the United States with those who benefit from their largess in the energy, real estate, and financial industries.

## II. ARGUMENTS

"The Complaint alleges that *Mirant sought a permit extension from BAAQMD in July 2003*[17] and that BAAQMD purported to grant it. (Complaint 30.) In fact, it now appears that Mirant did not approach BAAQMD in July 2003 seeking an extension. Instead, it now appears BAAQMD approached Mirant in October 2003 and inquired about its "substantial use" of the permit. *Sometime subsequent to Mirant's November 5, 2003 response, BAAQMD determined that Mirant had made substantial use of its permit*[18], and that, under its regulations, the permit would last for four years (until July 2005) pursuant to BAAQMD Regulation 2-1-407. (See App. B14-SU Request.)" [Motion p. 14 at 7 to 14]

After admitting that Mirant never sought any extension the United States would have your honor believe that "subsequent to Mirant's November 5, 2003 response, BAAQMD determined that Mirant had made substantial use of its permit" and that this action by BAAQMD doesn't demonstrate a pattern and practice of synergistic corruption between the BAAQMD (aka US EPA, United States) and the Defendant PG&E to allow the continued operation of its Gateway Generation Station without a PSD permit to discharge its thousands of tons of unregulated criteria pollutant, toxic air contaminants, and greenhouse gases in to a poor minority community already overburdened with chronic health conditions resulting from chronic exposures to existing pollution sources nearby.

To add insult to injury the United States would have your Honor believe because the "United States maintains that BAAQMD lacked the authority to administer Mirant's permit in

---

17 This is what Barry Minkow calls a Red Flag

November 2003" that that somehow ameliorated the harm that the PG&E's powerplant's unregulated emissions imposed on the surrounding adversely impacted community. It is statements like this that we allege demonstrate this pattern and practice of synergistic corruption between the United States and this time not with the Defendant but with the energy company Mirant instead.

In CARE's Petition for Review before the US EPA's Environmental Appeals Board ("Board" or "EAB")[19] *In re Russell City Energy Center, Russell City Energy Company, LLC, PSD Permit Application No. 15487, PSD Appeal No. 10-05*, CARE alleged synergistic corruption between BAAQMD and Russell City, LLC "(a) that the Air District prevented and/or failed to support public participation throughout the permitting process; (b) that the Air District issued flawed fact sheets, notices, and other documents; (c) that the Air District's response to CARE/Simpson's document requests under the California Public Records Act was inadequate; and (d) that the Air District has failed to issue any permit 'correctly'." [Petition at 15]

Like the Gateway Motion addressed herein in the Russell City administrative litigation we also allege that BAAQMD and Russell City are involved in synergistic corruption whose sole purpose is to protect Russell City, Pacific Gas and Electric Company (PG&E) and the huge hedge fund GE capital from losses.

> Like "Enron [GE Capital] was able to claim fantastic profits, constantly driving up their share price. But their profits were hypothetical – not actual - based on projected future earnings. Meanwhile the company was accumulating huge debt levels."

Based on the following quote from the United States' Motion it appears there may be a connection to GE capital in the Gateway project conspiracy as well.

"Construction work on the plant remained in limbo. By the end of August 2003, 18 months had elapsed since on-site construction had ceased (in February 2002) without the "permit" ATC being extended by EPA. Pursuant to the applicable federal regulation, 40 C.F.R. § 52.21(r) (2), the permit expired. Notwithstanding this, on October 27, 2003, BAAQMD wrote to

---

Continued from the previous page
[18] Remember this for later.
[19] See http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/f22b4b245fab46c6852570e6004df1bd/df250cdc9ddc2bce852576ef00513d84!OpenDocument

Mirant, reciting BAAQMD's Regulation 2-1-407 (the Four Year Rule quoted in Section 3, above), and asking Mirant to provide documentation that it had satisfied one of the criteria for "substantial use" of Mirant's original July 24, 2001, permit. (App. BI4-SU Request.) Mirant responded on November 5, 2003, providing information on its *contract with General Electric*.[20] (App. B15-SU Response.) Based on subsequent events, BAAQMD appears to have accepted this demonstration of "substantial use" which meant that, under Regulation 2-1-407, the 2001 permit would last four years until July 2005." [Motion p. 12 at 4 to 14] [*Emphasis* added]

As reported March 18, 2009 by Business Insider article *Major Concerns About GE Capital Ahead of Meeting*.[21] "Bloomberg has a good roundup of some of the company's trouble spots, which they'll be addressing tomorrow.*GE Capital's financial assets total $637 billion".

A "bottomless pit" of unsecured debt opened up worldwide when the Congress allowed unregulated banks to be created in 2000 in the Enron loophole. The "Enron loophole" exempted most over-the-counter energy trades and trading on electronic energy commodity markets from government regulation.[22] The "loophole" is so-called as it was drafted by Enron Corporation lobbyists working with U.S. Senator Phil Gramm (R-TX) to create a deregulated market for their experimental "Enron On-line" initiative.[23]The "loophole" was enacted in sections § 2(h)(3) and (g) of the Commodity Exchange Act, 7 U.S.C. as a result of the Commodity Futures Modernization Act of 2000, signed by U.S. president Bill Clinton on December 21, 2000. It allowed for the creation, for U.S. exchanges, of a new kind of derivative security, the single-stock future, which had been prohibited since 1982 under the Shad-Johnson Accord, a jurisdictional pact between John S. R. Shad, then chairman of the U.S. Securities and Exchange Commission, and Phil Johnson, then chairman of the Commodity Futures Trading Commission. On June 22, 2008, then U.S. Senator Barack Obama proposed the repeal of the "Enron loophole" as a means to curb speculation on skyrocketing oil prices.[24] In the first half of 2008 the notional

---

20 Remember the Red Flag.

21 See http://www.businessinsider.com/major-concerns-about-ge-capital-ahead-of-meeting-2009-3

22 Jickling, Mark (2008-07-07). "The Enron Loophole". Congressional Research Service. http://assets.opencrs.com/rpts/RS22912_20080707.pdf.

23 Mother Jones, http://www.motherjones.com/politics/2008/05/foreclosure-phil

24 "Obama vows crackdown on energy speculators: McCain fires back after Democrat tries to tie rival to 'Enron loophole" Associated Press 2008-06-22. http://www.msnbc.msn.com/id/25318274/

amounts outstanding of over-the-counter (OTC) derivatives continued to expand. Notional amounts of all types of OTC contracts stood at $683.7 trillion at the end of June 2008.[25]

## III. THE CULTURE OF SYNERGISTIC CORRUPTION

CARE's US EPA EAB Brief[26] *In re Russell City Energy Center* responding to the Brief of the Bay Area Air Quality Management District (BAAQMD) the State of California[27] and the Russell City Energy Center, LLC.[28] is relevant to our Gateway comments on the United States' Motion to demonstrate there is a pattern of synergistic corruption wherein BAAQMD, acting in behest of US EPA, an agency of the United States, are involved with PG&E and GE Capital in a corrupt organization whose purpose is to allow PG&E to knowingly construct and operate it Gateway Generating Station without the required PSD permit creating the culture of synergistic corruption.

Russell City argues at page 28 of its Brief[29] "[i]t is not always clear, however, what those issues are, and nowhere do CARE/ Simpson articulate specific objections to any condition of the final PSD permit so as to establish a basis for review. A number of their "issues" do not even relate to the RCEC Project, but to facilities and permit processes that are not at issue here; nor do they bear in any way on this proceeding, as with CARE/Simpson's discussion of issues surrounding the permitting of the Gateway Generating Station. *Id.* at 15-16. As a result, CARE/Simpson fail in this section to "provide sufficient specificity such that the Board can ascertain what issue is being raised" and to "articulate some supportable reason as to why the permitting authority erred or why review is otherwise warranted." *Knauf I*, 8 E.A.D. at 127. Thus, the Board should deny review on this basis alone."

---

[25] See http://www.bis.org/publ/otc_hy0811.pdf?noframes=1 at page 5.

[26] See http://yosemite.epa.gov/OA/EAB_WEB_Docket.nsf/Filings%20By%20Appeal%20Number/4E34993079D5751E852577360063D6B1/$File/Russell%20City%20Reply%20Brief%20Simpson%20CARE...101.pdf

[27] Under the auspices of the California Energy Commission (CEC) and California Public Utilities Commission (CPUC).

[28] Russell City Energy Center, LLC is owned 65 percent by a Calpine Corporation affiliate and 35 percent by a GE Energy Financial Services affiliate. See http://ceoworld.biz/ceo/2009/04/17/calpine-ge-receive-california-public-utilities-commission-approval-of-power-purchase-agreement-for-planned-bay-area-state-of-the-art-power-plant

[29] See http://yosemite.epa.gov/OA/EAB_WEB_Docket.nsf/Filings%20By%20Appeal%20Number/65524DD197ADC37985257715004ED223/$File/Response%20to%20Petition%20...%2073.01.pdf

In response, as non-attorneys, we attempted to "provide sufficient specificity such that the Board can ascertain what issue is being raised" and to "articulate some supportable reason as to why the permitting authority erred or why review is otherwise warranted" we alleged that because the issues surrounding the permitting of the Gateway Generating Station raise similar issues of fact and law to the case before the Board in Russell City and the issues we raise are directly relevant to what is going on in the Court with the Gateway Generating Station, and allege there is a common denominator, the hedge fund GE Capital, and the culture of synergistic corruption with PG&E Mirant and Calpine they have created. In our brief we will discuss what synergistic corruption is and why it is corrosive to social capital.

## IV. WHAT IS SYNERGISTIC CORRUPTION?

In the November 30, 2005 article by Dr. Robert Stevens titled "*What is Social Capital?*" at 1.[30] "According to the standard view, social capital is networks of relationships. Networks can be regarded as a form of capital since they are a resource that enables people to work together to achieve things that they could not easily achieve by themselves…Against the standard view, I will argue that networks do not always constitute a resource. In some cases they are a liability. Sometimes networks are socially corrosive. But social capital cannot by definition be a liability or socially corrosive…So I conclude that networks do not constitute social capital…I will argue that social capital is cooperation in pursuit of the common good."

Regarding synergistic corruption Mr. Stevens uses Enron as an example at page 3 to 4. "Bethany McLean and Peter Elkind in their book *The smartest guys in the room* document the story of the rise and fall of Enron, resulting in the largest bankruptcy case in US history. It was a story of "creative accounting". Enron was able to claim fantastic profits, constantly driving up their share price. But their profits were hypothetical – not actual - based on projected future earnings. Meanwhile the company was accumulating huge debt levels. By the end, Enron had accumulated debts of US $38 billion – only a third of which showed up on its balance sheet.

McLean and Elkind observe that the corrupt Enron executives could not have accomplished their deception without plenty of help.

> They needed accountants to agree that prepays were a trading liability…They needed lawyers to sign off on deal structures. They needed credit rating agencies

---

[30] See http://www.aare.edu.au/05pap/ste05642.pdf

> to remain sanguine in the face of frightening levels of off-balance sheet debt. Most of all, they needed the banks and the investment banks to help them carry out their machinations. (McLean and Elkind 2003 page 161-162)

Almost everyone associated with the company failed to do right thing. Such conspiracy – *synergistic corruption as it has been called* – certainly involved networks of people with shared values pursuing their goals. Each stood to profit mightily. On Field's account synergistic corruption is a form of social capital. It is not clear however, that synergistic corruption is straightforwardly an asset. Synergistic corruption undermines the ethical basis of business. I will argue later that promise making and keeping and honest dealing is a form of social capital that underpins an economy and a society of which it is a part. Synergistic corruption corrodes this form of social capital. It is more of a liability than an asset. Francis Fukuyama in "Social Capital and Civil Society" defines "social capital" as "an instantiated informal norm that promotes cooperation between two or more individuals" [Fukuyama 1999 page 1] Fukuyama argues that "Many groups achieve internal cohesion at the expense of outsiders, who can be treated with suspicion, hostility or outright hatred. Both the Ku Klux Klan and the Mafia achieve cooperative ends on the basis of shared norms, and therefore have social capital, but they also produce abundant negative externalities for the larger society in which they are embedded." [Fukuyama 1999 p. 2] Group cohesion secured at the expense of outsiders is obviously a liability for the larger society. As Fukuyama admits "It is very important when measuring social capital to consider its true utility net of its externalities." [Fukuyama 1999 p. 2] Too many negative externalities could presumably lead one to conclude that social cohesion secured at the expense of outsiders is not a form of capital at all."

## V. <u>REPLY TO UNITED STATES MOTION</u>

We allege if penalties against PG&E are implemented as proposed by the United States in its Motion, the Consent Decree would then be in violation of due process of law and 42 U.S.C. § 1983 since the United States has actively engaged in a conspiracy with PG&E to knowingly violate the Clean Air Act (CAA) by allowing PG&E to knowingly operate its Gateway Generation Station located in Antioch California without a PSD permit. The fact that the United States has knowingly allowed PG&E to operate this facility with impunity from CAA requirements despite receiving an NOV in September 2009 demonstrates a pattern and practice of synergistic corruption by the United States with PG&E.

> As EPA explains in its attached Response to Comments (App. C at pp 12-16), the major pollutants of concern from natural gas-fired power plants like Gateway are nitrogen oxides and carbon monoxide. EPA explains that the Decree's NOx and CO limits are virtually the same as those in PSD permits recently issued in this general geographic area, and, therefore, the limits in the proposed Decree do represent limits for these pollutants that would or could be imposed in a new PSD permit. EPA also explains why emissions of other pollutants like sulfur dioxide ("SO2") and particulate matter ("PM") are not issues of public health or environmental significance from natural gas-fired power plants. *So, while the citizens are correct that the settlement does not impose limits on those other pollutants, it does not mean the environment will suffer adverse consequences as a result.* When burned, natural gas simply does not produce levels of SO2 or PM that need to be controlled with specified emission rates. That is why natural gas is a far cleaner fuel than coal. Thus, from an air quality standpoint, the NOx and CO emission limits imposed by the proposed Decree put the environment in the same position as it would be if this case were fully litigated, the United States prevailed, and the court ordered PG&E to obtain a new PSD permit as the citizens demand. [Motion p.25 at 9 to 23]

This statement by the United States is false. It has been shown that there are links between socio-economic factors (ex: education, income, occupation) and people's health. This may be due to the fact that, in general, people with lower incomes tend to live in more environmentally polluted areas, have reduced access to health care, and in some cases, suffer a language barrier that puts them at a disadvantage for receiving services. In Contra Costa County, working class communities of color, in particular, bear a disproportionate share of health risk due to environmental factors. Increased health risks may include elevated instances of cancer, asthma, heart attacks and other serious health problems related to higher exposures to toxic air contaminants.

There are significant health impacts linked to power plant emissions. The US EPA has found that air pollutants emitted from industrial sources, such as power plants, increase the likelihood of adverse cardiovascular and respiratory impacts, as well as cause and worsen chronic health conditions, such as asthma.[31] These pollutants have also been linked to more serious health effects, such as cancer, permanent respiratory damage, and birth defects. Asthma is a respiratory disease that constricts the lungs and causes extreme breathing difficulties. In most

---

[31] *See, e.g.,* U.S. Environmental Protection Agency, Cleaning Up Common Pollutants, *available at* http://www.epa.gov/air/caa/peg/cleanup.html; California Air Resources Board, Asthma and Air Pollution, *available at* http://www.arb.ca.gov/research/asthma/asthma.htm

cases, prescription inhalers are necessary to help clear the airways in the event of an asthma attack. Lack of medical intervention for asthma attacks can lead to hospitalization, emergency room visits, and even death. Respiratory diseases, such as asthma, can be triggered by, and may even be caused by, exposure to ground level ozone (smog), and particulate matter. Emissions from the proposed project will increase local levels of particulate matter and volatile organic compounds, which may lead to an increase in childhood asthma in those communities. Like asthma, chronic obstructive pulmonary disease (COPD) is a common respiratory disease aggravated by high levels of smog pollution and poor air quality. COPD encompasses a group of respiratory diseases that includes chronic obstructive bronchitis and emphysema. People suffering from COPD typically experience varying levels of airflow obstruction and breathing difficulties. According to the US EPA:[32] COPD is the fourth leading cause of death in the U.S., the leading cause of hospitalization in adults, particularly in older adults, and is a major cause of morbidity, mortality, and disability.[33] Air pollution may be an important contributor to COPD. Although there are many factors that contribute to cancer (genetics, diet, lifestyle, environment, etc), certain carcinogenic pollutants are known to contribute to, and perhaps even cause certain types of cancers. Several of the compounds emitted by power plants are known carcinogens, or have been linked to increased cancer levels in certain areas.[34] Air pollution may be an important contributor to COPD.[35] Lung cancer has been linked to breathing polluted air, in addition to other factors. In fact, it has been shown that air pollution, mainly from vehicles, industries, and power plants, raises the chances of lung cancer and heart disease in people exposed to it long term.[36] Exposure to smog can not only aggravate existing conditions (such as asthma), but it also

---

[32] See EPA report of the environment- human disease and condition: http://cfpub.epa.gov/eroe/index.cfm?fuseaction=list.listBySubTopic&lv=list.listByChapter&ch=49&s=381

[33] American Lung Association. 2008. Chronic obstructive pulmonary disease (COPD) fact sheet. Accessed February 2009. http://www.lungusa.org/site/pp.asp?c=9oICLOOxGrF&b=1541153

[34] *Id.* According to the US EPA: COPD is the fourth leading cause of death in the U.S., the leading cause of hospitalization in adults, particularly in older adults, and is a major cause of morbidity, mortality, and disability.

[35] EPA report of the environment- human disease and condition: http://cfpub.epa.gov/eroe/index.cfm?fuseaction=list.listBySubTopic&lv=list.listByChapter&ch=49&s=381

[36] Lung Cancer, Cardiopulmonary Mortality, and Long-term Exposure to Fine Particulate Air Pollution, *Journal of the American Medical Association* (Vol. 287, No. 9: 1132-1141)

may increase susceptibility to respiratory illnesses, such as pneumonia and bronchitis. Numerous scientific studies have linked ground level ozone to a variety of serious respiratory and pulmonary problems, including: Airway irritation, coughing, and pain when taking a deep breath; Wheezing and breathing difficulties during exercise or outdoor activities; and Inflammation of the lungs, which is much like a sunburn on the skin.[37]

Repeated exposure to certain pollutants, such as ozone, can cause permanent lung damage in some cases. Like cancer, cardiovascular disease is caused by many factors, most of which are influenced by the patient (diet, exercise, lifestyle, smoking, high stress occupation, etc), but some are less easily controlled, such as environmental pollution.

### A. Nitrogen Oxides (NOx)

**Description:** The most harmful NOx is nitrogen dioxide (NO2). NOx react with ammonia, moisture, and other compounds to form small particles that penetrate deeply into the lungs. NOx is a primary ingredient in the creation of ozone (smog). NOx are listed as a "criteria pollutant" by the US EPA.[38] **Health Effects:** Lung irritation aggravates asthma or chronic bronchitis, bronchitis and emphysema-like conditions, increases susceptibility to respiratory infections.

### B. Ground Level Ozone (smog)

**Description:** Gas made up of three oxygen atoms (O3). Ozone is not emitted directly from power plants, but rather is formed by other emitted pollutants (NOx and VOCs) in the presence of sunlight. Ozone is the primary component in smog. More visible in summer when hot weather makes ozone levels worse. According to US EPA, ozone can be dangerous even at low levels. Ozone is listed as a "criteria pollutant" by the US EPA.[39] **Health Effects:** Coughing, chest pain, shortness of breath, eye, nose, and throat irritation; aggravates asthma, bronchitis, emphysema, and heart disease.

---

[37] *Ibid.*

[38] For more information on the health effects of Nitrogen Oxides (NOx), see http://www.epa.gov/air/nitrogenoxides/health.html

[39] For more information on the dangers and health effects of ozone, see "Smog - Who Does it Hurt?", downloadable at http://www.epa.gov/air/ozonepollution/health.html

### C. Carbon Monoxide (CO)

**Description;** Colorless, odorless gas. Created when carbon dioxide (CO2) is not burned completely. The highest levels of CO in the outside air typically occur during the colder months of the year when inversion conditions are more frequent, and air pollution becomes trapped near the ground beneath a layer of warm air. Carbon Monoxide is listed as a "criteria pollutant" by the US EPA.[40] **Health Effects:** At high levels, causes death. At low levels, fetal exposure results in underweight birth. Low birth-weight is linked to lifelong health effects like obesity and diabetes.

### D. Particulate Matter (PM)

**Description:** Made up of a number of components, including acids, organic chemicals, metals, and soil or dust particles. Can be formed in the atmosphere from sulfur dioxides (SO2) and nitrogen oxides (NOx). Particles can get deep into lungs, and even the bloodstream. Particulate matter is listed as a "criteria pollutant" by the US EPA.[41] **Health Effects:** Premature death, chronic irritation that can trigger asthma attacks. Known to aggravate other lung diseases, cause lung cancer, interfere with blood gas exchange, and increase risk of death from heart disease.

### E. Carbon Dioxide (CO2)

**Description:** Important greenhouse gas. Widely known as a pollutant responsible for global warming. New research suggests that CO2 forms "domes" over areas of mass pollution. These concentrated pockets elevate local levels of CO2, creating warming conditions that increase ozone formation.[42] CO2 domes thus worsen the effects of localized air pollution (pollution from ozone or particulates). **Health Effects:** Most of the effects from CO2 pollution are global, but localized CO2 domes worsen air quality in urban areas, causing respiratory problems, increasing rates of cancer, asthma, respiratory disease, hospitalizations, ER visit, and premature death in those areas.

---

[40] For more information on the health effects of Carbon Monoxide (CO), see http://www.epa.gov/air/urbanair/co/hlth1.html

[41] For more information on health effects from particulate matter pollution, see http://www.epa.gov/air/particlepollution/health.html

[42] For more information on CO2 domes, see Mark Jacobson's research "Enhancement of local air pollution by urban CO2 domes" http://pubs.acs.org/doi/abs/10.1021/es903018m?cookieSet=1&journalCode=esthag

## VI. 42 U.S.C. § 1983

This is a disputed matter within the Court's jurisdiction to investigate for violation of 42 U.S.C. § 1983, commonly referred to as "section 1983" which provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (emphasis added). Clearly the record herein, voluminous as it may be, demonstrates the District's actions in concert with PG&E, Lennar, Russell City Energy Center LLC, GE capital, the State of California "causes to be subjected, any citizen… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" in violation of the federal statute in this case in violation of due process and 42 U.S.C. § 1983 itself.

## VII. CONFUSION OR SYNERGISTIC CORRUPTION?

The United States would have your Honor believe that its lack of concern for the public's health and welfare is merely a matter of confusion amongst those responsible government agencies participating in the conspiracy with PG&E.

> Moreover, assessing PG&E' s liability and the scope of relief that may be appropriate in this case also must recognize that PG&E acquired the facility before it was built from another company, Mirant Delta; LLC, that had obtained the pre-construction permit in 2001, started construction only to discontinue it, and conveyed the facility (and its permit) to PG&E in late 2006. By that time, the United States maintains, the permit had already expired, but *the history of conduct by all the regulatory agencies involved -local, state, and federal - is a confused one*. [See Motion p. 2 at 22 to26 and p.3 at 1 to 2]
>
> The United States maintains this settlement is substantively fair because it results in the same environmental benefit that a new PSD permit would because it secures a meaningful mitigation project that actually increases the environmental benefit beyond what a new PSD permit would require. *The amount of the civil penalty* is a sore point with the citizens, but, as the United States explains in the next Section, it *is justified by the unusually confused factual history of this case*

> and by the United States' decision to spend its "settlement capital" securing more expansive environmental benefits through the mitigation project instead of attempting to obtain a higher civil penalty. [See Motion p. 24 at 25 to28 and p.25 at 1 to 4]
>
> The United States also agrees that civil penalties are needed to deter others from engaging in similar unlawful behavior. But not every case is necessarily a strong case to send a deterrent message. And *where the violations arise from a uniquely confused history that includes every regulatory agency -local, state and federal- contributing to that confusion, the need to send a message to deter other companies in such situations through a significant civil penalty is diminished.* Every agency involved in this matter in 2003, 2004, 2005, and 2006 apparently believed Mirant's permit to be valid, still in effect, and subject to extension. *While this does not legally excuse PG&E's violation, it does suggest to the United States that a court would look askance at an aggressive demand for civil penalties from PG&E in order to send a deterrent message.* If the case were fully litigated, we agree it is possible that evidence might be uncovered that calls this assessment into question. But if that possibility governed how the United States approached settlements, no cases could or should be settled without full discovery and litigation.[[43]]In the end, the United States' judgment here was that it made more sense to secure the guaranteed package of a civil penalty and OPFLEX mitigation project than to litigate this case for a higher penalty and for the *possibility* of obtaining the OPFLEX project from the Court either as an element of compliance or as mitigation. As mentioned above, EPA has explained why OPFLEX is not required for compliance with the law because OPFLEX is not BACT. (App. C at pp. 18-19.) Even if EPA has been too conservative in this respect, at a minimum, OPFLEX as BACT would have to be litigated with uncertain results. It would require an extensive evidentiary record to support a mitigation demand if this case were to be litigated. *(See United States* v. *Cinergy,* 618 F.Supp.2d at 949-954; 964-969, *supra.)* [Motion p.31 at 18 to28 and p.32 at 1 to 16][[44]]

If the United States was really concerned about the health and welfare of the public it would require PG&E to shutdown GGS until the local, state, and federal permiting process is begun anew to allow meaningful and informed public participation on the facility's emission control measures. This would insure the most precautionary approach for containing risk to the public's health and welfare from the project. Instead the United States has used so-called confusion to justify allowing PG&E an exemption from PSD requirements precluding the public from meaningful and informed participation on the PSD permit and to allow PG&E to avoid

---

[43] CARE agrees and requests your Honor allow such discovery and litigation.
[44] See above for explanation of why OPFLEX doesn't meet BACT requirements.

current BACT requirements for the plant to operate lawfully in compliance with the Clean Air Act ("CAA").

## VIII. CONCLUSIONS

For all the reasons outlined above we request your Honor grant the relief requested.

Respectfully submitted,

Michael E. Boyd President
CAlifornians for Renewable Energy, Inc. (CARE)
5439 Soquel Drive
Soquel, CA 95073
Phone: (408) 891-9677
E-mail: michaelboyd@sbcglobal.net

Mr. Lynne Brown Vice-President
CAlifornians for Renewable Energy, Inc. (CARE)
24 Harbor Road
San Francisco, CA 94124
E-mail: l_brown369@yahoo.com

s/ Rob Simpson
27126 Grandview
Hayward, CA 94542

June 14th, 2010

**Verification**

I am an officer of the Intervening Corporation herein, and am authorized to make this verification on its behalf. The statements in the foregoing document are true of my own knowledge, except matters, which are therein stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of June 2010, at San Francisco, California.

Lynne Brown

_______________________________

Lynne Brown Vice-President
CAlifornians for Renewable Energy, Inc.
(CARE)

**Certificate of Service**

I hereby certify that I have this 14th day of June 2010 served the foregoing document "*CAlifornians for Renewable Energy (CARE) Comments on United States' Memorandum in Support of Motion to Enter Amended Consent Decree*" before the United States District Court Northern California District San Francisco Division, Civil Action No. 09-4503 SI, transmitting the copies via e-mail to all parties who have provided an e-mail address. First class mail will be used if electronic service cannot be effectuated.

Michael E. Boyd

_____________________________

Michael E. Boyd
5439 Soquel Drive
Soquel, CA 95073
Phone: (408) 891-9677
E-mail: michaelboyd@sbcglobal.net