**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br>　　and<br><br>COMMUNITIES FOR A BETTER ENVIRONMENT,<br><br>　　　　Intervenor-Plaintiff,<br><br>　　v.<br><br>PACIFIC GAS & ELECTRIC,<br><br>　　　　Defendant.<br>　　　　　　　　　　　　　　　　　　／ | No. C 09-4503 SI<br><br>**ORDER GRANTING MOTION TO DISMISS COMMUNITIES FOR A BETTER ENVIRONMENT'S FIRST AMENDED COMPLAINT IN INTERVENTION AS AGAINST DEFENDANT BAY AREA AIR QUALITY MANAGEMENT DISTRICT** |

On January 21, 2011, the Court held a hearing on the Bay Area Air Quality Management District's motion to dismiss Communities for a Better Environment's first amended complaint in intervention. For the reasons set forth below, the Court GRANTS the motion to dismiss without leave to amend.

## BACKGROUND

**I.　Statutory background**

This case involves the "New Source Review" program of the Clean Air Act. The New Source Review program is designed to ensure that air quality in the United States attains and maintains National Ambient Air Quality Standards ("NAAQS"), which are health-based standards for the amount of air pollutant in the ambient air. The Clean Air Act's New Source Review program divides the nation into two areas – attainment areas, which are those that have attained NAAQS, and non-attainment areas,

1  which are those that have not attained the standards. 42 U.S.C. §§ 7470-7515. Areas designated as
2  either non-attainment or unclassifiable are subject to requirements to bring them into attainment,
3  including the non-attainment New Source Review ("NSR") permitting provisions. *Id*. §§ 7501-7515.
4  Attainment areas are subject to the Prevention of Significant Deterioration ("PSD") permitting
5  provisions. *See Alaska Dep't of Envtl. Conservation v. Envtl. Prot. Agency*, 540 U.S. 461, 469-75
6  (2004) (general explanation of PSD program). New sources of air pollution that are above certain
7  thresholds will trigger one or both of these New Source Review programs, depending on whether they
8  are located in a non-attainment area or an attainment area. There are different NAAQS for different
9  pollutants, and thus it is possible that a given area can be non-attainment of the NAAQS for certain
10 pollutants and attainment for other pollutants.

11       The Clean Air Act created a mechanism by which the states were encouraged to develop their
12 own regulatory approaches for implementing the NSR and PSD programs. Section 110(a) of the Clean
13 Air Act, 42 U.S.C. § 7410(a), sets forth the process by which the states may develop their own
14 regulatory programs, called "State Implementation Plans" ("SIPs"), that satisfy the minimum
15 requirements of the Clean Air Act. *See generally* 42 U.S.C. § 7410(a). A state's SIP "may not adopt
16 or enforce any emission standard or limitation which is less stringent" than the Act's requirements. 42
17 U.S.C. § 7416.   California has adopted the SIP approach in the San Francisco Bay Area with
18 respect to the non-attainment NSR program of the Clean Air Act, but not with respect to the attainment
19 area PSD program. For non-attainment NSR, the Bay Area Air Quality Management District (the state
20 agency created pursuant to the California Health and Safety Code with jurisdiction in the Bay Area, *see*
21 Cal. Health & Saf. Code §§ 40200-40276) has adopted regulations and has had those regulations
22 approved by the EPA. *See* 64 Fed. Reg. 3850 (Jan. 26, 1999) (codified at 40 C.F.R. §
23 52.220(c)(199)(i)(A)(8)). These "SIP-approved" non-attainment NSR regulations are set forth in
24 District Regulation 2, Rule 2. *See* District's RJN, Ex. 1. In contrast, California has not adopted its own
25 regulatory system to implement the Clean Air Act's PSD requirements in the Bay Area. PSD permitting
26 is governed by the federal PSD regulations which are codified at 40 C.F.R. § 52.21.

27       The federal PSD regulations contain a provision for EPA to delegate its authority to conduct
28 PSD source review and issue PSD permits. *See* 40 C.F.R. 52.21(u) ("The Administrator shall have the

authority to delegate [her] responsibility for conducting source review pursuant to this section . . . ."). At all times relevant to this lawsuit, the Air District had a delegation from EPA to administer the PSD program, with the exception of the period between March 3, 2003 to June 4, 2004.

Under the PSD permitting program, new proposed major sources of pollution must undergo an extensive permitting process before construction to ensure that their construction and operation will not contribute to deterioration of air quality. *See* 42 U.S.C. § 7470-7492. Before issuing a PSD permit, the Air District must perform an air quality impact analysis to ensure that the proposed emissions will not exceed the concentration allotted for ensuring that the area will remain in attainment. *See* 42 U.S.C. § 7475(a)(3). In addition, to minimize pollution, the Air District must impose the Best Available Control Technology ("BACT") to ensure that the most current and stringent pollution control technologies and emission limits are required before the source is built. *See* 42 U.S.C. § 7475(a)(4). The Act also requires public participation in the PSD permitting process. *See* 42 U.S.C. § 7470(5); 40 C.F.R. § 124.10.

Under federal regulations, PSD permits automatically expire when 18 months elapse from the time of issuance without construction. 40 C.F.R. § 52.21(r)(2). Automatic expiration ensures that major polluting sources use the most up-to-date pollution control technology. *See Sierra Club v. Franklin County Power of Illinois*, 546 F.3d 916, 934 (7th Cir. 2008). The 18-month period specified in section 52.21(r)(2) may be extended "upon a satisfactory showing that an extension is justified." 40 C.F.R. § 52.21(r)(2).

## II. Factual background

On July 24, 2001, the District issued a PSD permit to PG&E's predecessor, Mirant, to construct the Gateway Generation Station facility located in the Pittsburg and Antioch areas of Contra Costa County, California. Mirant began construction in late 2001 but ceased construction in February 2002. All parties to this lawsuit, except PG&E, agree that pursuant to governing federal regulations, the 2001

**United States District Court**
For the Northern District of California

permit expired in August 2003, 18 months after construction ceased. *See* 40 C.F.R. § 52.21(r)(2).[1] PG&E acquired the facility in 2006 and restarted construction, which was completed in 2008. The facility began commercial operation in January of 2009. Relevant to the instant motion, the District "renewed" the PSD permit in 2005 and 2007.[2]

Plaintiff/intervenor CBE has filed a complaint against BAAQMD seeking injunctive relief and civil penalties against the Air District based on the permitting history of the Gateway facility. CBE's claims against BAAQMD fall into two categories. First, CBE challenges actions the Air District allegedly took in connection with "purported renewals" of the expired PSD permit in 2005 and 2007. CBE alleges that the District "purported to renew" the expired PSD permit in 2005 and 2007, but did not conduct the technical analyses or provide the public participation opportunities that would have been required for a PSD permit. FAC ¶¶ 44, 46, 61, 62. Second, CBE challenges the Air District's failure to take enforcement action itself to prevent PG&E from constructing and operating the Gateway facility. CBE claims that the District should be subject to civil penalties "for each day that it allows operation of GGS without compliance with the PSD provision of the Act." FAC ¶ 64. CBE further claims that "[u]nless ordered by this Court, BAAQMD will continue to violate the PSD requirements of the Act by allowing construction and operation of GGS without requiring a PSD permit . . . ." *Id.* ¶ 66.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."

---

[1] PG&E asserts, in connection with the briefing on the United States' motion for approval of the consent decree between the United States and PG&E, that if the merits of the EPA's enforcement action against PG&E were litigated, PG&E would demonstrate that the 2001 permit did not expire in 2003, but instead remained in effect until 2005, at which time it was lawfully extended.

[2] Although the United States and the District have taken the position in this lawsuit that the 2001 PSD permit expired in 2003 under the relevant federal regulations, neither agency took that position prior to the filing of this enforcement action in 2009.

4

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

**DISCUSSION**

The Air District moves to dismiss CBE's complaint on both statutory and standing grounds. With regard to the statutory argument, the Air District contends that the Clean Air Act does not confer jurisdiction on this Court over claims seeking sanctions against state agencies for a failure to administer and enforce federal regulations. The Air District relies on *Brown v. Environmental Protection Agency*, 521 F.2d 827 (9th Cir. 1975), *vacated and remanded for consideration of mootness*, 431 U.S. 99 (1977) (per curiam)). In *Brown*, the EPA sued a state agency under the Clean Air Act, and sought sanctions, including injunctive relief and penalties, over the agency's failure to implement certain federally-adopted air quality regulations. The Ninth Circuit held that "the Clean Air Act does not authorize the imposition of sanctions on a state or its officials for failure to comply with the Administrator's regulations which direct the state to regulate the pollution-creating activities of those other than itself, its instrumentalities and subdivisions, and the municipalities within its borders." *Id*. at 831. The court stated, "[t]ersely put, the Act, as we see it, permits sanctions against a state that pollutes the air, but not against a state that chooses not to govern polluters as the Administrator directs." *Id*. at 832. The court

5

examined Section 113 of the Clean Air Act, which deals with "Federal enforcement procedures." The EPA contended that "inasmuch as the term 'person' is defined in subsection 302(e) to include a state, municipality, or political subdivision, subsection 113(a)(2) authorizes a civil action against a recalcitrant state." *Id*. at 833.

The District contends that *Brown* is applicable here because CBE's claims against the District are based on an alleged failure by the District to implement the federal PSD program. The District argues that CBE's claims are much different than claims seeking to enforce *state* regulatory programs that have been approved by EPA into a SIP, which courts have allowed to go forward under the Clean Air Act enforcement provisions. The District argues that "the critical difference is that with a SIP-approved state regulatory program, the State has formally agreed to a commitment to implement and enforce its state program to implement the Clean Air Act's mandates, in exchange for the federal government refraining from imposing its own regulatory program on the state through federal regulations. The *quid pro quo* for the federal government withholding its own power under the Clean Air Act to impose regulations on the state in this situation is that the state can be compelled to implement commitments it has made in the SIP to ensure that the Clean Air Act's goals are met." Motion at 13:24-14:6.

In *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir. 1977), the Second Circuit explained the difference between the situation presented in *Brown* and enforcement of a SIP-approved state program:

> The authorities relied upon by the district court as the basis for departure from our mandate, *Brown v. EPA*, *supra*, and *District of Columbia v. Train*, *supra*, are clearly inapplicable to this case. In each of those cases, . . . the EPA, a federal agency, sought to compel states or their political subdivisions to take steps (including appropriation of funds, adoption of legislation and use of state agencies and police) to implement and enforce a plan formulated by the EPA without any participation on the part of the state or any authorization of or consent to implementation or enforcement by the state. The basic question raised by these decisions, as to which we intimate no view, was whether the federal government might, without violating the state's Tenth Amendment rights, impose upon a state government a series of federal policy decisions concerning control of transportation-related pollution, and through imposition of sanctions require the state to enact and enforce appropriate measures essential to carry out the federal plan. The courts in those cases interpreted the Act as not permitting such intrusion by the federal government into state sovereignty except to the extent that the pollution might be caused solely by a source or activity controlled by the state (*e.g*., state-owned vehicles or incinerators) since the states otherwise might be deprived of control over the extent and manner in which their tax revenues could be spent and thus be turned into instruments for implementation of federally-dictated policies at variance with their own. All of this, it was indicated, might violate the states' Tenth Amendment rights or their right to a

6

> republican form of government. *See* Const. Art. IV, § 4.
>
> Although the district court here attempted to place the present case within the mold of *Brown*, *District of Columbia* and *Train*, the facts and the issues here are significantly different and clearly distinguishable. The most fundamental difference lies in the fact that, in contrast to those cases, the State here has clearly and unequivocally promulgated its own pollution-control plan which represents its own policy decision, formulated through public notice by the State to its citizens and local governments, and through State-conducted public hearings.
>
> The Plan was enacted in compliance with a statutory scheme which the State knew would result in federal approval so long as the State plan met the eight specified criteria, as well as in foreclosing promulgation of a federal plan that would have been enforceable against polluters by the EPA or by citizens. The State thus entered into a pact based on cooperative federalism under which it made the essential policy choices and determined the procedures that should be adopted by it and its subdivisions to comply with federal pollution standards which Congress undisputably had the power to enact under the Commerce Clause to protect the public health, since pollution is interstate in character and effect. Under this pact the State, as well as its subdivisions, became obligated to implement the Plan. In return, it received the assurance that the federal government would not substitute or administer its own plan. We find that this scheme does not impermissibly interfere with the governmental functions of the State or of its subordinate arm, the City.

*Id.* at 36-37.

CBE cites a number of cases for the proposition that it may bring claims against the District based on the District's management of the PSD program. *See* Opp'n at 12 (discussing citizen enforcement cases). The District argues that all of those cases are distinguishable because those cases involved citizen enforcement actions against state agencies where the agencies had adopted their own regulations (or committed to undertake regulatory measures), and had made binding commitments to implement them by submitting them to EPA and having EPA approve them as part of an SIP. CBE acknowledges that all of the cases upon which it relies arose in the SIP context. However, CBE argues that this is a distinction without a difference because a SIP, once approved by EPA, has "the force and effect of federal law." *Safe Air for Everyone v. United States Envtl. Prot. Agency*, 488 F.3d 1088, 1097 (9th Cir. 2007) (internal quotations omitted).

The Court agrees with the District that *Brown* forecloses CBE's claims against the District. The Court is not persuaded by CBE's argument that there is no difference between a citizen enforcement suit against a state agency for failure to implement a SIP and a citizen suit against a state agency for failure to implement federal regulations. As explained by the Second Circuit in *Friends of the Earth*, the crucial difference with SIP regulations is that the state has enacted the regulations and made the

7

"essential policy choices" on how to implement the Act in exchange for not having federal requirements imposed.

CBE argues that the Delegation Agreement, just like a SIP, represents a pact between the state and the federal governments, and thus the Air District should be liable when it has agreed to administer federal regulations pursuant to a delegation agreement. However, CBE does not cite any authority for the proposition that a state agency's entry into a delegation agreement permits citizen suits against the state agency for failure to properly administer the federal regulations. Indeed, as the Air District notes, there is no language in the Delegation Agreement suggesting that the District and EPA agreed that the District could be sued for sanctions to force the District to implement the federal PSD requirements. The Delegation Agreement states,

> If the EPA determines that the District is not implementing or enforcing the PSD program in accordance with the terms and conditions of this partial delegation agreement, the requirements of Regulation 2 – Rule 2, 40 CFR 52.21, 40 CFR 124 or the Clean Air Act, this partial delegation agreement may be revoked in whole or in part. Any such revocation shall be effective as of the date specified in a Notice of Revocation to the District.

Delegation Agreement ¶ IV.4 (RJN Ex. A). In addition, the Delegation Agreement provides that the District retains the right to decline to implement the PSD permitting functions at any time by relinquishing the delegation. *See id.* ¶ IV.5 (District can relinquish delegation if it finds that it cannot "fully and satisfactorily carry out" its delegated responsibilities); *id.* ¶ VIII..3 (District will refer enforcement to EPA if it is "unwilling or unable" to do so itself). Thus, the Delegation Agreement explicitly provides that in the event that the District is not implementing or enforcing the PSD program, either the EPA can revoke the delegation agreement, or the District can relinquish delegation or refer enforcement to the EPA. The Delegation Agreement does not state that if the District is not implementing or enforcing the PSD program that the District could be sued for sanctions.

CBE advances several other arguments about why *Brown* does not bar CBE's claims against the District, none of which are persuasive. First, CBE argues that *Brown* applies only to federal enforcement cases, not to citizen suits brought under Section 304(a) of the Clean Air Act. CBE argues that *Brown* is based on an analysis of the term "person" in a completely different statutory context, Section 113 of the Act, which pertains to EPA's authority to bring civil actions against violators. CBE

8

argues that it brings its action pursuant to the citizen suit provision, Section 304(a), and that the plain language of Section 304(a) authorizes CBE's claims. Section 304(a) of the Act provides,

**(a) Authority to bring civil action; jurisdiction**

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf–

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator of a State with respect to such a standard or limitation.

42 U.S.C. § 7604(a)(1).

CBE argues that in contrast, Section 113 of the Act, which permits the EPA to bring civil actions against "any person" who has violated an applicable implementation plan or permit, does not define "person." In *Brown*, the EPA argued that "inasmuch as the term 'person' is defined in subsection 302(e)[3] to include a state, municipality, or political subdivision, subsection 113(a)(2) authorizes a civil action against a recalcitrant state." *Brown*, 521 F.2d at 833. The Ninth Circuit held, "[w]hile we are not prepared to say that under no circumstances should the term 'person' be read to include a state when in used in connection with a sanction-imposing provision of the Act, we are convinced that section 113(a)(2) is designed to provide the Administrator with power to enforce against polluters provisions of an implementation plan not being enforced by the state. Moreover, we are not convinced that the section is designed to equip the Administrator with power to sanction the non-enforcing state." *Id.* at 834. Thus, contrary to CBE's assertion, the *Brown* court did not reach its holding by finding that subsection 113 did not define "person" to include a state agency; to the contrary, the *Brown* court recognized that section 302(e)'s definition of "person" – which included a "state, municipality, or political subdivision" – applied to section 113, but instead held that under the circumstances presented in *Brown*, the EPA could not bring an enforcement action against the state agency. The Court concludes that if the reference to "State, municipality, political subdivision of a State" in Section 302(e) is limited in scope by the factors the Ninth Circuit relied on in *Brown*, those same factors should be read to limit

---

[3] Section 302 of the Clean Air Act contains definitions applicable "[w]hen used in this chapter." 42 U.S.C. § 7602. The "chapter" at issue is Chapter 85 of Title 42, the Clean Air Act.

9

the scope of "governmental instrumentality or agency" in Section 304(a).

CBE has not cited any authority for the proposition that citizen suit enforcement should extend to compelling states to implement federal regulatory requirements. Nor does CBE cite any authority for the contention that citizen suits under Section 304(a) may pursue a wider variety of enforcement actions than governmental enforcement agencies may pursue under Section 113(a). *Cf. Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987) ("A citizen plaintiff, when bringing an enforcement action, supplements the enforcement power of the EPA. . . . [I]n those suits citizen plaintiffs effectively stand in the shoes of EPA."). Moreover, the legislative history of Section 304 strongly suggests that the scope of citizen enforcement powers under Section 304 is not broader than the scope of enforcement actions under Section 113. The Senate Committee report for the Senate Bill that created Section 304 in 1970 states that "[t]his new section provides jurisdiction in the Federal district courts . . . to hear and decide civil actions instituted by any citizen or class of citizen . . . . The actions may be brought against any person, as that term is defined in section 302(e) of the Act . . . ." S. Rep. No. 91-1196, at 64-65 (quoted in *N.R.D.C. v. Train*, 510 F.2d 692, 725 (D.C. Cir. 1974). Indeed, *Sierra Club v. Korleski*, 716 F. Supp. 2d 699 (S.D. Ohio 2010), upon which CBE relies heavily, held that both citizens and the EPA could bring suit against a state for failure to enforce a SIP because "the language of § 7413(a)(1) cannot be distinguished from the language I am called on to construe in Section 7604(a)(1)(A)." *Id*. at 707; *see also id*. at 708 n.1 ("One difference between the statutes is that § 7604(a)(1)(A) authorizes a citizens suit while § 7413(a)(1) authorizes suit by the U.S. EPA. But the critical words to construe are 'anyone' who 'violates.' Since in both statutes the violator is 'anyone,' I do not see how the identity of the person authorized to bring suit would change the construction of § 7604(a)(1)(A).").

CBE also argues that since the time that *Brown* was decided in 1975, the Act has been amended significantly to enlarge the definition of emissions standards or limitations that citizens can enforce. However, none of the amendments cited by CBE indicate that Congress intended to change the Clean Air Act's enforcement mechanisms to provide for sanctions against state agencies for failure to implement federal regulatory requirements. Moreover, as the District notes, after the 1977 and 1990 amendments, courts have continued to cite *Brown* for the proposition that the Clean Air Act does not

provide for sanctions against state agencies for failure to implement federal regulatory requirements. *See, e.g.*, *Virginia v. Browner*, 80 F.3d 869, 883 (4th Cir. 1996).

Accordingly, the Court concludes that CBE's claims against the District must be dismissed because the Clean Air Act does not confer jurisdiction over claims against state agencies for implementation of federal regulations. As such, the Court does not reach the CBE's alternative grounds for dismissal.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the District's motion to dismiss CBE's first amended complaint in intervention without leave to amend. (Docket No. 73).

**IT IS SO ORDERED.**

Dated: January 24, 2011

SUSAN ILLSTON
United States District Judge