1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

               Plaintiff,

  and

COMMUNITIES FOR A BETTER
ENVIRONMENT,

             Intervenor-Plaintiff,

  v.

PACIFIC GAS & ELECTRIC,

            Defendant.

_____/

No. C 09-4503 SI

**ORDER DENYING WILD EQUITY INSTITUTE'S MOTION TO INTERVENE AND GRANTING PLAINTIFF'S MOTION TO ENTER THE PROPOSED SECOND AMENDED CONSENT DECREE**

On February 25, 2011, the Court held a hearing on Wild Equity Institute's motion to intervene and plaintiff's motion to enter the proposed second amended consent decree. For the reasons set forth below, the Court DENIES Wild Equity Institute's motion to intervene and GRANTS plaintiff's motion to enter the consent decree.

**BACKGROUND**

This case concerns the Gateway Generating Station, a power plant located near Antioch, California. In September 2009, the United States Environmental Protection Agency ("EPA") filed a complaint against defendant PG&E, alleging that PG&E constructed the Gateway Station and operated it in violation of the New Source Review program of the Clean Air Act. The EPA alleges that a 2001 New Source Review permit authorizing construction of the Gateway Station expired before PG&E constructed the plant and began operating it.

United States District Court
For the Northern District of California

1    The EPA and PG&E entered into settlement negotiations, and now request that the Court

2    approve and enter a proposed second amended consent decree.  Intervenor Communities for a Better

3    Environment ("CBE") opposes the proposed consent decree, and has filed objections thereto.  Wild

4    Equity Institute ("WEI"), a non-profit environmental group, seeks to intervene in order to allege claims

5    under the Endangered Species Act against the EPA.  WEI claims that the proposed second amended

6    consent decree is a federal agency action that requires the EPA to consult with the United States Fish

7    and Wildlife Service regarding the possible effect of the consent decree on an endangered species

8    located near the Gateway Station, the Lange Metalmark butterfly, prior to entry of the consent decree.

9    Now before the Court are the United States' motion for approval and entry of the proposed second

10   amended consent decree and WEI's motion to intervene.

11

12   **I.      Statutory background**

13   The New Source Review program of the Clean Air Act is designed to ensure that air quality in

14   the United States attains and maintains National Ambient Air Quality Standards ("NAAQS"), which

15   are health-based standards for the amount of air pollutant in the ambient air.  The Clean Air Act's New

16   Source Review program divides the nation into two areas – attainment areas, which are those that have

17   attained NAAQS, and non-attainment areas, which are those that have not attained the standards.  42

18   U.S.C. §§ 7470-7515.  Areas designated as either non-attainment or unclassifiable are subject to

19   requirements to bring them into attainment, including the non-attainment New Source Review ("NSR")

20   permitting provisions. *Id.* §§ 7501-7515.  Attainment areas are subject to the Prevention of Significant

21   Deterioration ("PSD") permitting provisions. *See Alaska Dep't of Envtl. Conservation v. Envtl. Prot.*

22   *Agency*, 540 U.S. 461, 469-75 (2004) (general explanation of PSD program).  New sources of air

23   pollution that are above certain thresholds will trigger one or both of these New Source Review

24   programs, depending on whether they are located in a non-attainment area or an attainment area.  There

25   are different NAAQS for different pollutants, and thus it is possible that a given area can be non-

26   attainment of the NAAQS for certain pollutants and attainment for other pollutants.

27   The Clean Air Act created a mechanism by which the states were encouraged to develop their

28   own regulatory approaches for implementing the NSR and PSD programs.  Section 110(a) of the Clean

1   Air Act, 42 U.S.C. § 7410(a), sets forth the process by which the states may develop their own

2   regulatory programs, called "State Implementation Plans" ("SIPs"), that satisfy the minimum

3   requirements of the Clean Air Act.  *See generally* 42 U.S.C. § 7410(a).  A state's SIP "may not adopt

4   or enforce any emission standard or limitation which is less stringent" than the Act's requirements.  42

5   U.S.C. § 7416.  California has adopted the SIP approach in the San Francisco Bay Area with respect to

6   the non-attainment NSR program of the Clean Air Act, but not with respect to the attainment area PSD

7   program.  For non-attainment NSR, the Bay Area Air Quality Management District (the state agency

8   created pursuant to the California Health and Safety Code with jurisdiction in the Bay Area, *see* Cal.

9   Health & Saf. Code §§ 40200-40276), has adopted regulations and has had those regulations approved

10  by the EPA.  *See* 64 Fed. Reg. 3850 (Jan. 26, 1999) (codified at 40 C.F.R. § 52.220(c)(199)(i)(A)(8)).

11  These "SIP-approved" non-attainment NSR regulations are set forth in District Regulation 2, Rule 2.

12  *See* District's RJN, Ex. 1.  In contrast, California has not adopted its own regulatory system to

13  implement the Clean Air Act's PSD requirements in the Bay Area.  PSD permitting is governed by the

14  federal PSD regulations which are codified at 40 C.F.R. § 52.21.

15          The federal PSD regulations contain a provision for EPA to delegate its authority to conduct

16  PSD source review and issue PSD permits.  *See* 40 C.F.R. 52.21(u) ("The Administrator shall have the

17  authority to delegate [her] responsibility for conducting source review pursuant to this section . . . .").

18  On April 23, 1986, EPA delegated to the Air District the "authority of the administrative and

19  enforcement elements" of the PSD program's implementing regulations, subject to the terms, conditions

20  and reservations of authority set forth in that agreement.  App. B1-1986 Delegation Agreement at 1.

21  In part, the agreement stated that "EPA has determined that the PSD portion of the District Rule 2 of

22  Regulation 2 [BAAQMD Regulation 2-2-101] . . . generally meets the requirements of 52.21; therefore,

23  District permits issued in accordance with Rule 2 of Regulation 2 will be deemed to meet federal PSD

24  permit requirements pursuant to the terms of this delegation agreement."  *Id.*

25          The Air District's PSD regulations extended beyond Rule 2 of Regulation 2.  Rule 1 of

26  Regulation 2 (BAAQMD Regulation 2-1-407) also contained provisions governing the administration

27  of permits, including the provision on permit terminations and extensions at issue in this case.  Rule 1

28  is discussed in greater detail *infra*.   Rule 1 was not explicitly mentioned in the 1986 delegation

3

agreement or any subsequent delegation agreement.  The EPA asserts that "[t]hus, it is less clear whether EPA also determined that the provisions of Rule 1 'generally met' the requirements of § 52.21.  However, since permits issued 'in accordance with Rule 2' also needed to be issued in accordance with Rule 1, it is at least arguable that EPA meant to endorse Rule 1 similarly."  United States' Motion at 7:22-25.

Under the PSD permitting program, new proposed major sources of pollution must undergo an extensive permitting process before construction to ensure that their construction and operation will not contribute to deterioration of air quality.  *See* 42 U.S.C. §§ 7470-7492.  Before issuing a combined PSD permit and Authority to Construct ("ATC")[1], the Air District must perform an air quality impact analysis to ensure that the proposed emissions will not exceed the concentration allotted for ensuring that the area will remain in attainment.  *See* 42 U.S.C. § 7475(a)(3).  In addition, to minimize pollution, the Air District must impose the Best Available Control Technology ("BACT") to ensure that the most current and stringent pollution control technologies and emission limits are required before the source is built.  *See* 42 U.S.C. § 7475(a)(4).  The Act also requires public participation in the PSD permitting process.  *See* 42 U.S.C. § 7470(5); 40 C.F.R. § 124.10.

Under federal regulations, PSD permits expire when 18 months elapse from the time of issuance without construction.  40 C.F.R. § 52.21(r)(2).  Expiration ensures that major polluting sources use the most up-to-date pollution control technology.  *See Sierra Club v. Franklin County Power of Illinois*, 546 F.3d 918, 934 (7th Cir. 2008).  The 18-month period specified in section 52.21(r)(2) may be extended "upon a satisfactory showing that an extension is justified."  40 C.F.R. § 52.21(r)(2).

In contrast, the Air District's Rule 1 of Regulation 2 (referred to by the parties as the "Four Year Rule" or "Regulation 2-1-407") provides, in relevant part,

> **Permit Expiration:** An authority to construct shall expire two years after the date of issuance, unless substantial use of the authority has begun. . . . An authority to construct that has not expired after two years, due to substantial use or renewal, shall expire after four years.

---

[1]  The combined PSD permit and ATC are referred to herein as "the PSD permit."

4

App. B11.[2]  The claims in this case arise out of the interplay between the federal and Air District regulations regarding expiration of PSD permits, and how this conflicting regulatory scheme was applied to PG&E and its predecessor, Mirant.

## II.    Factual background

On July 24, 2001, the Air District issued a PSD permit to PG&E's predecessor, Mirant, to construct Contra Costa Power Plant Unit 8 ("CC8").  App. B7.  The permit states, "In accordance with Regulation 2-1-407, this Authority to Construct expires two years from the date of issuance unless substantial use of authority has begun."  *Id*. at 2.  The plant was later known as "Delta Unit 8," and, after PG&E acquired it, as the Gateway Generating Station.  Mirant began construction in late 2001 but ceased construction in February 2002.  Mirant never resumed construction.

In December 2002, the EPA promulgated regulations implementing fundamental changes to the federal PSD program.  Shortly thereafter, the Air District informed the EPA that it could not incorporate those changes into its regulations.  On March 3, 2003, the EPA's revised regulations took effect and, on the same day, EPA revoked the Air District's previously delegated authority to implement the PSD program.  The United States asserts that at that point, the EPA was the only entity with authority to issue or to administer PSD permits.

Mirant never resumed construction on the Gateway facility.  The United States and intervenor CBE contend that pursuant to governing federal regulations, the 2001 permit expired in August 2003, 18 months after construction ceased.  *See* 40 C.F.R. § 52.21(r)(2).  Notwithstanding both the EPA's revocation of the Air District's delegated authority and the expiration of the permit under federal regulations, on October 27, 2003, the Air District wrote to Mirant, reciting the Air District's Regulation 2-1-407 (the Four Year Rule), and asking Mirant to provide documentation that it had satisfied the criteria for "substantial use" of Mirant's original July 24, 2001 permit.  App. B14-SU Request.  Mirant responded and provided information on November 5, 2003.  App. B15-SU Response.  Based upon subsequent events discussed *infra*, the Air District appears to have accepted Mirant's demonstration of

---

[2]  Effective June 1, 2005, Regulation 2-1-407 was amended to provide that PSD permits expire two years after issuance, subject to renewal under certain circumstances.

United States District Court
For the Northern District of California

"substantial use" which meant that, under Regulation 2-1-407, the 2001 permit was effective until July 2005.

On June 21, 2004, the EPA partially redelegated PSD authority to the Air District.  The redelegation agreement provides authority to issue certain new permits and to make "administrative" or "minor" modifications of existing PSD permits specifically identified in the redelegation agreement. One of the PSD permits specified by name as redelegated was the July 24, 2001 permit authorizing construction of the Gateway facility.  The June 21, 2004 redelegation agreement explicitly stated that "[t]he Permit to Operate [Delta Unit 8] has not yet been issued as of May 7, 2004."  App. B16-2004 Delegation Agreement at 4.

In July 2005, the Air District purported to extend Mirant's permit again.  At this time, the applicable Air District regulation stated that "every ATC will expire two years after the date of issuance, though if substantial use had begun during the initial term or during a renewal term, the ATC could be renewed upon request."  BAAQMD Regulation 2-1-407.3 (effective June 1, 2005).  On January 24, 2006, the EPA again partially redelegated authority to the Air District to administer permits for two additional plants beyond those included in the June 21, 2004 delegation.  As with the June 21, 2004 redelegation agreement, the January 24, 2006 redelegation agreement stated that the permit covering the Delta Unit 8 plant had been redelegated.  App. B40-2006 Limited Delegation Agreement at 1, 4.

In 2006, PG&E acquired the CC8/Mirant Delta #8 project from Mirant, and on January 18, 2007, the California Energy Commission authorized PG&E to restart construction of the newly renamed Gateway Generating Station.  App. B42-Excerpt of CEC Petition at 1-1.  On February 5, 2007, PG&E restarted construction.

In December 2007, in the midst of constructing the Gateway facility, PG&E notified the Air District that it needed an amended Authority to Construct because its construction plans had changed. EPA App. B19.  PG&E's December 2007 application proposed a number of substantive changes to emissions, including an increase in the allowable carbon monoxide ("CO") emissions during

commissioning[3]; an increase in allowable CO emissions during turbine startups; an increase in the annual CO emission limit; and a reduction in the permitted hourly emission rates for nitrogen oxides ("NOx"), CO and particulate matters ("PM-10") based on the current best available control technology ("BACT"). *Id.* at i. The Air District processed PG&E's amendment request, publishing an engineering evaluation of the proposed amendment for public comment on June 4, 2008. App. B21-Draft PSD Permit; App. B22-Public Comment Invite. Throughout this period, PG&E continued constructing the Gateway Station, finishing the project in November 2008. On February 13, 2009, PG&E withdrew its applications to amend, stating that the amendment was "no longer necessary." App. B25-Withdrawal of Petition; App. B24-Withdrawal of Application. According to PG&E, PG&E withdrew its amendment application because the major elements of that application were no longer necessary, as the actual emissions data from the plant during commissioning showed that the plant was in full compliance with the original permit limits. *See* Rubenstein Decl. ¶¶ 10-13.

**III.    Proposed second amended consent decree**

    **A.    Original amended consent decree**

       In 2009, the EPA and PG&E entered into negotiations regarding the alleged Clean Air Act violations. Those negotiations were successful, and resulted in a proposed consent decree. Under the terms of the original proposed amended consent decree, PG&E agreed to a reduction in emissions of two pollutants emitted by natural gas-fired power plants – NOx and CO – to levels that represent emissions achieved through the application of BACT. Under the allegedly expired 2001 PSD permit, PG&E is authorized to emit NOx at a rate of 2.5 parts million on a dry basis, and it is permitted to emit CO at a rate of 6.0 parts per million on a dry basis. The original amended consent decree required PG&E to reduce its emissions of NOx to 2.0 parts per million and its CO emissions to 4.0 parts per million. Amended Consent Decree ¶¶ 6-8. The Decree also reduced the annual tonnage cap on NOx emissions from 174.3 tons per year to 139.2 tons per year. *Id.* ¶¶ 7, 11.

       The amended consent decree also required PG&E to install and make fully operational two

---

[3] "Commissioning" is the period after construction and prior to commercial operation when a facility's ability to meet operating performance and emission standards is tested.

software packages (called "OPFLEX" products) that are intended to reduce both the duration of startups and the number of startups and shutdowns at the Gateway Station and the higher NOx emissions that result from startups and shutdowns. *Id.* ¶¶ 14-15. The decree also requires PG&E to pay a civil penalty in the amount of $20,000 to resolve its alleged liability. *Id.* ¶ 4. The decree contains provisions for stipulated penalties for noncompliance, force majeure, and dispute resolution. *Id.* ¶¶ 16, 23-26, 32-40.

### B.    Proposed second amended consent decree

After this lawsuit was filed, the United States reviewed recent actual emissions data from the Gateway Station to address concerns expressed by CBE and others about the environmental impact of the plant's emissions. Based on that review, the EPA informed PG&E that the new data required renegotiation of the term in the settlement addressing emissions of CO. The United States invited CBE to join those discussions and to include any additional issues they believed could lead to a collective settlement. Additional changes were made to the consent decree, resulting in the proposed second amended consent decree, but CBE still opposes entry of the consent decree.

The proposed second amended consent decree imposes further reductions on CO emissions, and includes new terms governing emissions of sulfur dioxide ("$SO_2$") and particulate matter ("PM-10").[4] The new CO emissions limit is 2.0 parts per million. According to the United States, the recent emissions data showed that the Gateway Station was capable of achieving lower CO emissions without a major capital investment in new design or technology. Instead, the CO emission control catalyst will need to be changed more often than in newer plants with a more expansive design. Under the new limits for $SO_2$, the plant may not emit more than 18.5 tons of $SO_2$ per year, and the plant may burn only CPUC natural gas[5] with a total sulfur content of no more than one grain per 100 standard cubic feet of natural

---

[4] The EPA states that it regards a more stringent level on CO as essential if the United States to preserving the settlement, and that it does not regard the new $SO_2$ and PM terms as essential, but that "such terms were nonetheless added by the United States and PG&E to obviate the need for the Court to continue to weigh the objections of citizens to the absence of such terms in the original settlement." United States' Reply at 2:25-28.

[5] "CPUC natural gas" meets the specifications for "pipeline quality" natural gas established by the California Public Utilities Commission. App. C-Response to Comments at 15.

United States District Court
For the Northern District of California

gas.  The new emission limits for PM-10 are .004 pounds per mission British thermal units of natural gas combusted, and 7.50 pounds per hour when the duct burners in the heat recovery steam generator are not in operation and 9.0 pounds per hour when the duct burners are in operation.

**DISCUSSION**

**I.      Wild Equity's motion to intervene**

Wild Equity Institute ("WEI") seeks to intervene in this action to file a complaint against the EPA alleging claims under the Endangered Species Act ("ESA").  WEI alleges that the EPA's settlement of this enforcement action against PG&E constitutes an "agency action" under the ESA, and that the EPA failed to consult with the Fish and Wildlife Service ("FWS") to ensure that the continued existence of the endangered Lange's metalmark butterfly is not jeopardized as a result of this alleged agency action (hereinafter referred to as a "Section 7 consultation"), thereby violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).  WEI's Proposed Compl. ¶¶ 40-41.  Second, WEI alleges that by settling with PG&E, EPA is making irreversible and irretrievable commitments of resources without engaging in an FWS consultation, violating ESA Section 7(d), 16 U.S.C. § 1536(d).  WEI Proposed Compl. ¶¶ 42-43.        The United States and PG&E oppose intervention.  They argue that (1) WEI is not entitled to intervene under the Clean Air Act because WEI is not seeking to supplement the government's enforcement of the Act against PG&E, (2) WEI's motion should be denied as untimely, and (3) WEI's motion should be denied because WEI proposes to state invalid claims against EPA under the ESA.

**A.      Intervention as of right under the Clean Air Act**

WEI asserts that it has an unconditional right to intervene because the Clean Air Act provides a statutory right to intervene in this matter.  42 U.S.C. § 7604(b)(1)(B) provides that "No action may be commenced under subsection (a)(1) of this section – . . . (B) if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right."  Subsection (a)(1), in turn, provides,

**(a) Authority to bring civil action; jurisdiction**

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf–

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation

42 U.S.C. § 7604(a)(1). Thus, read together, Section 304(a)(1) and 304(b)(1)(B) authorize the filing of citizen suits against "any person . . . who is alleged to have violated . . . or be in violation of . . . an emission standard or limitation under [the Clean Air Act] . . . or . . . an order issued by the Administrator or a State with respect to [a] standard or limitation [under the Clean Air Act]," but also bar citizen suits where EPA is "diligently prosecuting a civil action . . .," except that citizens may intervene as of right in those actions. The plain language of Section 304 allows a citizen to intervene as of right only in order to enforce compliance with the Clean Air Act. *See Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 973 (3d Cir. 1982) ("The citizen suit provision of the Clean Air Act provides a right to intervene to enforce the law; it does not confer a right to intervene on behalf of an alleged violator or to seek to inhibit enforcement.").

WEI asserts that Section 304(b)(1)(B) permits broad and unconditional intervention, and that the right to intervene under Section 304(b)(1)(B) is not limited by any restrictions contained in Section 304(a)(1) on the filing of citizen suits. However, WEI's interpretation of the statute flies in the face of the plain language of Section 304(b)(1)(B), which begins with the language "No action may be commenced under subsection (a)(1) of this section . . .". WEI does not cite any authority for the proposition that a citizen has a broad right to intervene as a matter of right in a Clean Air Act enforcement action to assert non-Clean Air Act claims against the EPA.

The one case cited by WEI, *Baughman v. Bradford Coal Company*, 592 F.2d 215 (3d Cir. 1979), does not support WEI's position. In *Baughman*, a group of citizens filed a citizen suit under the Clean Air Act against a coal company alleging violations of Pennsylvania's State Implementation Plan. The coal company argued that the citizen suit was barred by Section 304(b)(1)(B) because prior to the filing of the citizen suit, the Pennsylvania Department of Environmental Resources began an action before the

10

1   Pennsylvania Environmental Hearing Board for civil penalties against the coal company, alleging the

2   same violations of Pennsylvania's SIP.  The coal company argued that the citizen suit was barred by

3   Section 304(b)(1)(B) of the Clean Air Act because the civil penalty action before the Hearing Board was

4   a prior "civil action in a court of . . . a State to require compliance" with the state PIP.  *Baughman*, 592

5   F.2d at 217 (quoting 42 U.S.C. § 7604(b)(1)(B)).  The Third Circuit disagreed, holding that the Hearing

6   Board was not a "court of . . . a State" because "to constitute a 'court' in which proceedings by the State

7   will preclude private enforcement actions under § 7604, a tribunal must have the power to accord relief

8   which is the substantial equivalent to that available to the EPA in federal courts under the Clean Air

9   Act."  *Id.* at 219.  *Baughman* does not hold that citizens have a broad right to intervene in EPA

10  enforcement actions to allege non-Clean Air Act claims, and to the contrary, *Baughman*'s discussion

11  of the interplay between the right to file a citizen suit under Section 304(a)(1), and the preclusion of

12  such suits and the concomitant limitation on the right to intervene in enforcement actions under Section

13  304(b)(1)(B), makes clear that the two provisions must be read and interpreted together.

14          Accordingly, the Court concludes that WEI may not intervene as a matter of right pursuant to

15  Section 304(b)(1)(B) of the Clean Air Act to allege claims under the ESA against EPA.

16

17      **B.      Intervention under FRCP Rule 24(a)(2)**

18          Alternatively, WEI seeks to intervene under Federal Rule of Civil Procedure 24(a)(2).  Under

19  Federal Rule of Civil Procedure 24(a)(2), an applicant for intervention of right must demonstrate that

20  "(1) it has a significant protectable interest relating to the property or transaction that is the subject of

21  the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's

22  ability to protect its interests; (3) the application is timely; and (4) the existing parties may not

23  adequately represent the applicant's interest."  *United States v. Alisal Water Corp.*, 370 F.3d 915, 919

24  (9th Cir. 2004) (internal quotation marks omitted).  The party seeking to intervene bears the burden of

25  showing that all the requirements for intervention have been met.  *Id*.

26

27          **1.      Timeliness**

28          A district court's determination concerning the timeliness of an application for intervention is

**United States District Court**
For the Northern District of California

11

1    reviewed for an abuse of discretion. *See United States v. Carpenter*, 298 F.3d 1122, 1124 (9th Cir.

2    2002). "Timeliness is measured by reference to (1) the stage of the proceeding at which an applicant

3    seeks to intervene; (2) the prejudice to other parties; and (3) the reason for the length of the delay." *Id.*

4    at 1125 (internal quotations omitted).

5        The United States and PG&E contend that WEI's motion to intervene is untimely. They argue

6    that WEI has offered no reasonable justification for filing its motion to intervene on December 31, 2010,

7    some 15 months after public notice of the settlement, six months after discovery was completed, two

8    months after final briefs on the consent decree were filed, and only three weeks before the hearing on

9    the United States' motion to enter the proposed second amended consent decree.[6] The United States

10   argues that WEI should have known that its interests might be at stake as early as October 5, 2009, when

11   the United States published notice in the Federal Register of the lodging of the consent decree and

12   solicited public comments. The Federal Register notice stated that the consent decree would impose

13   "more stringent limits for emissions of nitrogen oxides (NOx)" at "Gateway Generating Station, a

14   natural gas fired power plant located near Antioch, California." 74 Fed. Reg. 51170-51171 (Oct. 5,

15   2009). The United States and PG&E also argue that they will be prejudiced by WEI's intervention

16   because, absent intervention, all that remains in this litigation is the Court's ruling on the motion to enter

17   the proposed consent decree.

18       WEI responds that it was first alerted to "EPA's intention to avoid compliance with the ESA"

19   when the United States filed its reply brief in support of the motion to enter the consent decree on

20   October 26, 2010. WEI argues that none of the previous filings, including the public notices,

21   communicated EPA's intention to violate the ESA.

22       The Court finds WEI's explanation for the delay less than compelling. The proposed settlement

23   was first published in the Federal Register in October 2009. 74 Fed. Reg. 51170 (Oct. 5, 2009). The

24   Department of Justice re-noticed the settlement in the Federal Register on November 9, 2009, and

25   extended the public comment period from the usual 30 days to 90 days in response to requests from

26   _____

27       [6] The hearing was scheduled for January 21, 2011. As a result of WEI's motion to intervene, the Court ordered supplemental briefing on the issue of whether a consent decree constituted an "agency action" under the ESA, and rescheduled the hearing on WEI's motion to intervene and the United

28   States' motion to enter the proposed consent decree to February 25, 2011.

United States District Court
For the Northern District of California

1   members of the public. 74 Fed. Reg. 57703 (Nov. 9, 2009). Numerous comments were received, but

2   WEI did not submit any comments. *See generally* App. A. WEI asserts that it assumed that in the

3   course of settling this action that EPA would consult, or had consulted, with FWS about the impact of

4   the consent decree on the Lange's Metalmark butterfly. However, as discussed *infra*, WEI has not cited

5   any authority for the proposition that a consent decree triggers the Section 7 consultation requirement.

6   In the absence of any such authority, and in light of two separate public notices and numerous filings

7   in this case that made no mention of EPA consulting with FWS, the Court finds WEI's assumption that

8   the EPA was or would consult with FWS  unreasonable and unjustified. Accordingly, the Court finds

9   that WEI's motion to intervene is untimely.

10

11          **2.      Significantly protectable interest relating to the subject of the
                        action/impairment of that interest**

12

13          "An applicant for intervention has a significantly protectable interest if the interest is protected

14   by law and there is a relationship between the legally protected interest and the plaintiff's claims."

15   *Alisal Water Corp.*, 370 F.3d at 919. The United States contends that even if all of the facts alleged in

16   WEI's proposed complaint are true, WEI's claims are legally unsupportable because the settlement does

17   not constitute either an "agency action" or an "irreversible and irretrievable commitment of resources"

18   within the meaning of the ESA. The United States and PG&E also argue that even if WEI can allege

19   claims under the ESA, WEI's interests would not be impaired if denied intervention because it can

20   pursue other avenues of relief.

21          Under Section 7(a)(2) of the ESA, a federal agency must consult with the appropriate federal

22   fish and wildlife agency to "insure that any action authorized, funded or carried out by such agency [i.e.,

23   agency action] is not likely to jeopardize the continued existence of any endangered species or

24   threatened species." 16 U.S.C. § 1536(a)(2). If an agency determines that its proposed action "may

25   affect" an endangered or threatened species, the agency must formally consult with the relevant Service,

26   depending on the species that are protected in the area of the proposed action. *See Pacific Rivers*

27   *Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir.1994). According to the implementing regulations,

28          Action means all activities or programs of any kind authorized, funded, or carried out,
             in whole or in part, by Federal agencies in the United States or upon the high seas.

> Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. The regulations also state that Section 7 consultation applies to "all actions in which there is discretionary Federal involvement or control." *Id*. § 402.03. Thus, in order for the Section 7 consultation requirement to apply, the consent decree must be an "agency action" over which the EPA has discretionary involvement or control. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 667 (2007) (holding that EPA's regulation applying consultation and no-jeopardy mandates of the ESA only to situations in which there is discretionary federal involvement or control was reasonable and entitled to *Chevron* deference).

### a. Agency action

WEI asserts that "[a]lthough this appears to be a case of first impression, the broad interpretation of the term 'agency action' and the nature of consent decrees make clear that the EPA must undergo consultation before the decree is entered." Supp. Brief at 12:5-7. WEI argues that the proposed consent decree is an action included under both subsections (c) and (d) of the regulations, namely that the consent decree is a contract and that it is an action "directly or indirectly causing modifications to the land, water or air." WEI cites authority regarding the contractual nature of consent decrees, and argues that as adopted, the consent degree will cause modification to the air by granting PG&E legal authority to add nitrogen and other pollutants into the air.

WEI relies on *Natural Resources Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998). In that case, the Ninth Circuit held that the Section 7 consultation requirement was triggered when the Bureau of Land Management renewed a number of water contracts. The Ninth Circuit rejected the argument that the contract renewals did not constitute "agency action." The court noted that "the term 'agency action' has been defined broadly," *citing TVA v. Hill*, 437 U.S. 153, 173(1978), and held "[c]learly, negotiating and executing contracts is 'agency action.'" *Houston*, 146 F.3d at 1125. WEI also cites a number of other cases, as well as Black's Law Dictionary, for the proposition that a consent decree is similar to a contract.

14

The United States and PG&E contend *Houston* is inapposite because a proposed consent decree is not like an ordinary contract. They argue that the proposed consent decree is a negotiated settlement of an enforcement action under the Clean Air Act, voluntarily agreed to by both parties, which by its express terms becomes effective only upon its approval by this Court and its entry as a judicial order. The United States and PG&E acknowledge that a consent decree is in many respects like a contract, and that courts employ concepts of contract law in interpreting them. However, they argue that a consent decree differs from a contract because judicial action transforms the parties' agreement into an enforceable court order. Thus, they argue that a consent decree is a judicial action, and not an "agency action" triggering the Section 7 consultation requirement.

The United States and PG&E assert that no court has ruled that judicial settlement of an enforcement action constitutes an "agency action" under the ESA, and WEI has not cited any such authority. One court has explicitly held that a consent decree is not an "agency action" and thus does not trigger the Section 7 consultation requirement. In *Turtle Island Restoration Network v. United States Dep't of Commerce*, CV. Nos. 09-00598 DAE-KSC, 10-00044 DAE-KSC, 2011 WL 344117 (D. Haw. Jan. 31, 2011), the court held that "[b]ecause a consent decree is a 'judicial act' rather than an agency act, Federal Defendants are not required to ensure that their stipulation to the proposed consent decree complies with [various environmental statutes, including the ESA]." *Id*. at *5. The court held,

> As a preliminary matter, "[A] consent decree has attributes of both a contract and a judicial act." *Olney v. United States*, 543 F.3d 1168, 1173-74 (9th Cir. 2008). "Consent decrees entered in federal court must be directed to protecting federal interests." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). The Supreme Court has characterized a consent decree as "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992); *Frew*, 540 U.S. at 437 (same). Further, "[a] consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions, including . . . citations for contempt." *Randolph*, 736 F.2d at 528. A court may also "modify a consent decree in certain circumstances over the objection of a signatory." *Local No. 93*, 478 U.S. at 518 (citation omitted). Accordingly, although a contract between parties, a consent decree's enforcement is entirely dependent upon judicial act.

*Id*. at *5. The court held that "the ESA does not contemplate its applicability to judicial act. Instead, by its plain language, it requires federal agencies taking action that could potentially threaten a listed species' habitat to comply with its terms." *Id*. at *9.

WEI argues that *Turtle Island Restoration Network* is factually distinguishable because in that case the federal agency had already undergone consultation regarding the underlying issue. In that case, the plaintiffs challenged the adequacy of the Biological Opinion that supported the agency's decision to increase the limits on the number of sea turtles that longline fisheries could injure or kill in a season. After the lawsuit was filed, the parties entered into a proposed consent decree under which the part of the Biological Opinion supporting those increased limits would be vacated, and the agency agreed to conduct another round of consultation to create a new biological opinion. An intervenor argued that the consent decree was contrary to the law because it allowed the federal agency to circumvent a number of environmental statutes, including the ESA. WEI asserts that the *Turtle Island* intervenor's argument was nonsensical because the intervenor was arguing that the agency was required to consult on its decision to consult. Here, in contrast, WEI asserts that while the agency consulted with FWS when the original PSD permit was granted, that consultation did not address the Lange Metalmark butterfly, and thus there has never been any Section 7 consultation about this species.

Although WEI is correct that *Turtle Island* factually differs from this case, the court's decision in *Turtle Island* did not rest on the fact that the agency had already engaged in a Section 7 consultation. Instead, the court held that as a matter of law a consent decree is not an "agency action" that triggers the Section 7 consultation requirement. WEI also disagrees with *Turtle Island* to the extent that the court "was arguing that there is no contractual nature to a consent decree." Supp. Brief at 12:15-16. However, the *Turtle Island* court expressly recognized that "[a] consent decree has attributes of both a contract and a judicial act," but concluded that because a consent decree is a judicial act, it was not an "agency action" under the ESA.

The United States contends that WEI's interpretation is utterly unworkable as a practical matter and would lead to absurd results under the ESA:

> First, litigation would commence, whether, as here, brought by the United States in its enforcement capacity, or by a plaintiff against the United States in a challenge to federal agency action as allowed by the APA or the citizen-suit provision that provides a waiver of sovereign immunity, such as the one in the ESA. *See* 16 U.S.C. § 1540. If the parties reached a point where they desired to settle the litigation, they would engage in negotiations to arrive at a set of mutually acceptable terms that would ultimately constitute a proposed consent decree. It is presumably at this point that WEI believes the federal agency that is a party to the proposed consent decree would be required to initiate consultation with FWS and/or NMFS. . . .

The ESA requires that consultation be completed within 90 days, but that period may be extended to "such other period of time as is mutually agreeable." 16 U.S.C. § 1536(b)(1)(A). In other words, consultation may take a substantially longer time than 90 days, which is not uncommon given the breadth and complexity of the issues addressed through formal consultation. To enable this to unfold, the court would need to stay the litigation in order to allow the consultation process to proceed. More significantly, however, with the settlement process slowed down, any benefits that would result from the settlement would be delayed and pushed off to an undefined date. Therefore, requiring agencies to go through the consultation process would impede the attempts of the United States to halt and remedy existing violations of environmental law, which would in turn frustrate the intent of the environmental statutes involved.

. . . [F]ormal consultation ends with the issuance of a "biological opinion" by the consulting agency, describing how the proposed action may affect the listed species at issue. 16 U.S.C. § 1536(b)(3)(A). If the proposed action is likely to jeopardize the continued existence of the species, the consulting agency will then identify "reasonable and prudent alternatives" that the consulting agency believes are necessary to avoid jeopardy to the species. . . .

If an agency were required to engage in consultation on a proposed settlement, and a determination were reached that necessitated the development of RPAs, it is unclear how the adoption of the RPAs would play out in the settlement context, or if they could at all. The federal government would be forced to reopen settlement talks with the opposing party, thereby exacerbating the problem of delay discussed above. Moreover, the opposing party would be under absolutely no obligation to accept these RPAs – indeed, if the opposing party is private entity (as PG&E is here), it cannot be compelled to abide by them, as the requirements of Section 7 apply only to federal agencies. Or, if the opposing party rejected the idea of renegotiation altogether, the case (which would otherwise have been settled), would have to be litigated on the merits.

United States' Supp. Brief at 12:4-13:21.

WEI does not dispute the United States' description of the Section 7 consultation process, or its description of how that process would play out in the settlement context. Instead, WEI asserts that "instances when a consent decree will impact endangered species are few and far between." Supp. Brief at 2:10-11. The United States and PG&E dispute this assertion, and they emphasize the sheer breadth of federal environmental regulation, the number of endangered species, areas of designated critical habitat, and the large number of environmental enforcement cases prosecuted and settled since passage of the ESA in 1972.

The Court is persuaded that a proposed consent decree is not an "agency action" under the ESA. There is nothing in the ESA or the regulations suggesting that a consent decree is an "agency action." The Court finds it significant that WEI has not been able to locate any authority interpreting a consent decree as an "agency action" under the ESA, and that the only case squarely addressing the issue has held that it is not. As the United States argues, if the consent decree constitutes an "agency action" that

triggers Section 7 consultation, it would effectively remove the ability to settle environmental enforcement litigation.

### b.    Irreversible and irretrievable commitment of resources

Wild Equity's second proposed claim for relief alleges that the "EPA is violating Section 7(d) of the ESA and its implementing regulations by making irreversible and irretrievable commitments of resources by entering agreements to continue operating the Gateway Generating Station without initiating, reinitiating, or completing the consultation process with FWS to ensure that the EPA's action do[es] not jeopardize the continued existence of the Lange's Metalmark Butterfly."  Proposed Compl. ¶ 43.

> Section 7(d) of the ESA provides,
>
> (d) Limitation on commitment of resources
>
> After initiation of consultation required under subsection (a)(2) of this section, the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

16 U.S.C. § 1536(d).  As the language of the section states, the restrictions of Section 7(d) only apply in the context of an agency action that is subject to consultation.  For the reasons stated *supra*, the Court concludes that the consent decree does not constitute an "agency action" and that consultation is not required under Section 7(a)(2).  Therefore Section 7(d) is inapplicable.

### c.    "Reinitiation" of consultation

In the supplemental briefing, WEI also asserts that the EPA is required to reinitiate consultation because there is new evidence about the effect of nitrogen emissions on the Lange Metalmark butterfly that was not considered at the time of the original Section 7 consultation in 2001.[7]  Under 50 C.F.R.

---

[7]  Documents submitted by WEI show that EPA consulted with FWS about the Lange's Metalmark butterfly prior to the issuance of the PSD permit to Mirant in 2001.  *See* Plater Decl. Ex. C at 2 ("The following species are identified as occurring near the Project area but not likely to be adversely affected by the Project: . . . Lange's metalmark butterfly (Apdemia monno langei).");  *see also* United States' Reply, Ex. F (July 12, 2001 letter from EPA to Air District notifying the Air District that

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

§ 402, an agency is required to reinitiate consultation,

> where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
>
> . . .
>
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; . . .

50 C.F.R. § 402.16(b).

"Even if this lawsuit would affect the proposed intervenors' interests, their interests might not be impaired if they have 'other means' to protect them." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). Here, WEI's claim that EPA is required to reinitiate consultation because there is new information about the harmful effects of nitrogen emissions on the Lange's Metalmark butterfly is independent of the issues and claims in this case. The entry of the proposed consent decree will not impair WEI's ability to file a separate lawsuit to allege this claim and protect its interest.[8] *See e.g.*, *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969 (9th Cir. 2003).[9]

## II.    United States' motion to enter proposed second amended consent decree

### A.    Legal standard

Approval of a proposed consent decree is within the discretion of the Court. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). A court reviews a consent decree to determine whether it

---

the EPA "has concluded its consultation with the U.S. Fish and Wildlife Service (FWS) on the construction of Unit 8 at the Contra Costa Power Plant, as required by Section 7 of the Endangered Species Act (ESA), through use of the informal consultation process.").

[8] In addition, as both the United States and PG&E note, WEI may raise its endangered species concerns before the California Energy Commission ("CEC") when, as required by the consent decree, PG&E applies to amend its Conditions of Certification to incorporate the decree's lowered limits for NOx and other pollutants. Second Amended Consent Decree ¶ 6. Under state regulations, the CEC must consider whether the proposed amendments to certification have any significant adverse environmental effects. 20 Cal. Code of Regs. § 1769(a)(1)(E) and (F); § 1769(a)(2); § 1769(a)(3).

[9] At the hearing, the United States asserted that WEI could file a separate lawsuit alleging claims under the ESA, and stated that the United States retains the authority to seek to modify the consent decree after it is entered.

United States District Court
For the Northern District of California

is "fundamentally fair, adequate and reasonable." *Id*. The Court must evaluate both the procedural and substantive fairness of the consent decree. *United States v. Chevron*, 380 F. Supp. 2d 1104, 1110-11 (N.D. Cal. 2004). In addition, while a consent decree "must conform to applicable laws . . . [it] need not impose all the obligations authorized by law." *Oregon*, 913 F.3d at 580.

The Court's review of the proposed consent decree is informed by the public policy favoring settlement. *See United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000). "This deference is particularly strong where the decree has been negotiated by the Department of Justice on behalf of an agency like the EPA which is an expert in its field." *Chevron*, 380 F. Supp. 3d at 1111. However, when reviewing a proposed consent decree, the Court must independently evaluate its terms and avoid giving a "rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995) (quoting *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 462 (2d Cir. 1974)).

In applying the "fair, adequate and reasonable" standard, courts examine both procedural and substantive fairness. *See United States v. Cannons Engineering Corp*., 899 F.2d 79, 86 (1st Cir.1990). With regard to procedural fairness, courts determine whether the negotiation process was "fair and full of adversarial vigor." *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (citations and internal quotations omitted). If the decree was the product of "good faith, arms-length negotiations," it is "presumptively valid and the objecting party has a heavy burden of demonstrating the decree is unreasonable." *Oregon*, 913 F.2d at 581. However, "the district court must ensure that the agreement is not . . . a product of collusion . . . ."). *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir.1991)

With respect to substantive fairness, the Court does not determine whether "the settlement is one which the court itself might have fashioned, or considers ideal." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Instead, the "court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Oregon*, 913 F.2d at 581 (internal quotations omitted). "The court need only be satisfied that the decree represents a reasonable factual and legal determination." *Id*. (internal quotation omitted).

**A.      Procedural fairness**

CBE contends that the proposed consent decree was not the result of arms-length or procedurally fair negotiations because PG&E authored the essential terms of the decree.  CBE emphasizes the facts that the negotiations resulting in the original amended consent decree only took 90 days, and that the United States accepted several of PG&E's requested changes.  CBE also objects that the public was not invited to participate in its pre-settlement negotiations with CBE.  However, at least some of CBE's objections about procedural fairness have been addressed by the fact that after this lawsuit was filed, CBE participated in further settlement negotiations, leading to further emissions limits as reflected in the proposed second amended consent decree.

CBE argues that this case is similar to that of *United States v. Telluride Co.*, 849 F. Supp. 1400 (D. Colo. 1994).  In *Telluride*, the court denied approval of a consent decree between the EPA and the Telluride Company (Telco).  The court found, *inter alia*, that "the record shows that the EPA relied heavily, if not exclusively, on Dr. Olgeirson, Telco's environmental expert, to produce the work plan for Telco's remediation and mitigation projects."  *Id.* at 1404.  The court found that because "the EPA simply reacted to the proposals offered by Telco's expert," the judgment of the EPA was entitled to little deference.  *Id.*  The court also found, *inter alia*, that the EPA had  "ignored evidence that Telco's action was knowing, willful and perhaps criminal in light of its previous experience with wetlands permits," and that "Telco is required to restore only 15.43 acres of wetlands at the ski area, despite estimates that approximately 45 to 47 acres were destroyed there . . . ."  *Id.* at 1405.

The Court finds that *Telluride* is distinguishable.  Unlike *Telluride*, the record does not show that PG&E dictated the settlement terms and that EPA simply accepted whatever PG&E wanted.  The United States has submitted the declaration of its counsel, W. Benjamin Fisherow, which describes the settlement process.  Mr. Fisherow states, *inter alia*, that on June 26, 2009, he and EPA's counsel communicated their initial settlement position to PG&E orally by telephone and at an in-person meeting.  United States' Reply Ex. H ¶ 4.  The United States then prepared the initial draft consent decree and provided it to PG&E.  *Id.* ¶ 5.  Contrary to CBE's assertions, the United States proposed many of the terms in the settlement.  The fact that the United States accepted several of PG&E's requested changes does not mean that the settlement process was unfair or collusive.

**United States District Court**
For the Northern District of California

The record also shows that, while the United States did not invite various citizen groups to participate in the initial negotiations, the United States did meet with citizens during the public comment period and again after the comment period closed; the United States offered to extend the comment period for 60 additional days to enable the citizens to fully prepare their objections; the United States attempted to broker discussions between the citizens and PG&E; the United States fully responded to CBE's discovery probing into the settlement process; and the United States invited CBE to participate in the renegotiation of the consent decree.

Most of CBE's objections about procedural unfairness really stem from CBE's contention that the proposed second amended consent decree is substantively unfair, and thus the settlement resulted from a procedurally unfair negotiations in which the EPA did not vigorously represent the public interest. Accordingly, the Court turns to CBE's substantive objections to the proposed second amended consent decree.

**B.      Substantive fairness**

The United States contends that the proposed consent decree is substantively fair because the consent decree's limits on NOx, CO, PM-10 and $SO_2$ are virtually the same as those in PSD permits recently issued in this general geographic area, and therefore the limits in the proposed decree represent limits for these pollutants that would or could be imposed in a new PSD permit.[10] The EPA cites other consent decrees that have been approved and that contain higher (or no) emissions limits than the proposed consent decree in this case. For example, in *United States v. Nevada Power*, Civ. No. 02-07-00771 (D. Nev. 2007) (attached as App. E), the consent decree, which was entered in 2007, imposed a NOx emission limit of 5 parts per million ("ppm") based on a 1 hour average. (App. E ¶¶ 29, 30). The proposed consent decree here imposes a more stringent limit of 2 ppm based on a 1 hour average. The

--------

[10]   While the United States renegotiated the terms of the proposed second amended consent decree to include limits on PM-10 and $SO_2$ emissions, the United States does not believe that these limits will result in lower emissions of particulate matter or $SO_2$. The Gateway Station is required to burn only natural gas which meets the specifications for "pipeline quality" natural gas established by the CPUC. The United States asserts that BACT for PM-10 and $SO_2$ is limiting the fuel burned to CPUC natural gas, and that no natural gas-fired combined cycle unit limited to CPUC natural gas has additional control technology to reduce PM-10 and $SO_2$ emissions.

1   *Nevada Power* decree did not impose any limit on CO or any other pollutant.

2          For the most part, CBE's objections regarding emissions limits have been addressed by the new

3   limitations on NOx, $SO_2$ and PM-10 contained in the proposed second amended consent decree.  CBE

4   does object that the proposed second amended consent decree does not set limits on the duration and

5   number of startup and shutdown events, including the emissions allowed during each event.  CBE

6   asserts that the recent emissions data from the Gateway Station shows that PG&E can achieve lower

7   limits.  The United States responds that "[i]n the United States' view, the 2001 ATC/PSD permit issued

8   by BAAQMD, which is still valid and federally enforceable, contains startup and shutdown limits for

9   NOx [and CO] emissions, both for the duration or and emissions allowed during each event, which are

10  comparable to, and in fact more stringent than, other recently-issued PSD permits for combined cycle

11  electric generating units of the type used at GGS."  Reply at 4:23-28, 5:12-14 (citing App. C-Response

12  to Comments at 12-13).  In addition, the United States notes that EPA's Environmental Appeals Board

13  has held that BACT determinations do not require a limitation on the number of startup and shutdown

14  events.  *See In re Rockgen Energy Center*, PSD Appeal No. 99-1, Order Denying Review in Part and

15  Remanding in Part, 8 E.A.D. 536, 551-55 (EAB 1999).

16         CBE also generally objects that "after over a year – time that PG&E could have spent going

17  through permitting – the public is now stuck with emissions limits that are equivalent to what a draft

18  PSD permit was likely to have proposed in a proper permitting procedure."  CBE's Second Oppo. at

19  11:3-4.  Thus, CBE implicitly recognizes that the emissions limits contained in the proposed second

20  amended consent decree would likely be the same or similar to the emissions limits that would be

21  contained in a new PSD permit.  The United States responds that the structure of this New Source

22  Review settlement is the same as every one of the other 18 PSD settlements the United States has

23  negotiated involving a power plant.  The United States explains,

24         All such cases basically flow from the same contested premise that the defendant failed
           to obtain a proper PSD permit before constructing a new facility or modifying an
25         existing one.  In *every* such case, a remedy for the alleged violation *could* be the
           straightforward requirement to obtain a new PSD permit.  The United States has not
26         adopted that course in any settlement involving a power plant.  Instead, all such
           settlements impose the actual emission limits and other restrictions the United States
27         regards as the approximate equivalent to the substantive result of a new permitting
           process. The United States' reason in settling in this fashion is that it guarantees results
28         – actual, appropriate, judicially enforceable emission reductions – without the delay and

                                                    23

uncertainty entailed when directing a source to engage in the full-blown proceedings involved in obtaining a new PSD permit.

Motion at 27:11-19.  CBE does not dispute the United States' statement that the other 18 PSD settlements followed the same structure.  While CBE would prefer that PG&E be required to go through a new permitting process, there is nothing that mandates such a process, and the Court finds the United States' reasons for structuring the settlement in this fashion to be reasonable.[11]

The United States also contends that the environment will be better off under this settlement than if the case were successfully litigated because of the OPFLEX mitigation project.  The consent decree requires PG&E to install and make fully operational two software packages (called "OPFLEX" products) that are intended to reduce both the duration of startups and the number of startups and shutdowns at the Gateway Station and the higher NOx emissions that result from startups and shutdowns.  In response to CBE's assertion that OPFLEX is BACT and therefore is simply part of compliance with the law, the United States asserts that OPFLEX has not been required as part of any new PSD permit for such facilities, and OPFLEX has not yet been adopted as the "best available" control technology by any permitting agency to EPA's knowledge.  The United States asserts that even if it litigated this case and prevailed, and the Court ordered PG&E to obtain a new PSD permit and install BACT, it is not likely that OPFLEX would be required as part of it.

CBE also objects that the United States did not choose a mitigation project that more directly benefitted the community.  However, the United States responds that a mitigation project must be tied to the alleged harm it is mitigating, and that the closer the tie to the adverse effect of the violation, the more defensible the project is as mitigation.

Many of CBE's substantive objections are directed at the civil penalty.  CBE contends that the $20,000 civil penalty is inadequate for a variety of reasons.  CBE argues that PG&E gained an economic benefit from (1) skipping the permitting and public participation process and consequently not paying for the permitting fees and costs associated with PSD permit analyses, including analyses of greenhouse gases, air quality, and endangered species impacts, and (2) operating earlier than it would have, had it

---

[11]  For the same reason, the Court finds that PG&E's decision to withdraw its application to amend the PSD permit does not provide a reason to conclude that the proposed second amended consent decree is unfair.

United States District Court
For the Northern District of California

properly gone through a permit process, and thus earning a revenue earlier than it would, had it waited to complete the permitting process. However, PG&E has submitted the declaration of Joseph O'Flanagan, which explains that contrary to CBE's assertions, an "earlier in-service date does not impact the amount of PG&E's return," and that in fact, a delay in operations "would likely result in higher earnings and revenues for the facility." O'Flanagan Decl. ¶¶ 4-5; *see also id.* ¶¶ 5-9 (explanation of how utility earns revenue when plant is under construction by accruing "Allowance For Funds Used During Construction").

CBE also emphasizes the following facts: (1) EPA settled for $15,000 above PG&E's initial offer of $5,000, with just a single offer and counteroffer, (2) the $20,000 penalty is less than one day of penalties for one violation of the Clean Air Act ($37,500), 40 C.F.R. § 19.4, and (3) the penalty is far less than a day's profit from the Gateway facility (approximately $95,000 pre-tax, per day in 2009).

The United States asserts that a number of factors led it to decide that its settlement leverage would be better spent securing PG&E's agreement to perform a costly mitigation project that would directly benefit the public and environment affected by the plant than demanding a higher civil penalty that, if obtained, would be deposited into the United States Treasury. *See* 31 U.S.C. § 3302(c)(1). The United States also asserts that CBE has downplayed the litigation risk. The United States argues that the risk here does not come from concern over what the regulatory scheme means, but from what the government regulators said and did as they exercised their respective authorities under the regulations, and from the implications of their actions with respect to PG&E's liability and the government's remedy.

The Court finds that under the facts of this case, the terms of the consent decree are substantively fair. The consent decree imposes emissions limits that represent BACT, and CBE does not contend that lower emissions limits would be required if PG&E was required to obtain a new permit. The alleged violations here arise from a uniquely confused history that includes every regulatory agency contributing to that confusion, and thus the need to send a deterrent message in such situations through a significant civil penalty is diminished. There is a litigation risk over the scope of EPA's revocation of the Air District's authority to administer PSD permits between March 2003 and June 2004. CBE states that the EPA never approved Rule 1 of BAAQMD's Regulation 2 under which the GGS PSD permits were

United States District Court
For the Northern District of California

purportedly extended.   However, as the United States notes, the initial 1986 delegation, and all subsequent delegations, only specifically mentioned Rule 2 of BAAQMD's Regulation 2 and did not mention Rule 1 of BAAQMD's Regulation 2.  The United States asserts that "[t]hus, it is less clear whether EPA also determined that the provisions of Rule 1 'generally met' the requirements of § 52.21. However, since permits issued 'in accordance with Rule 2' also needed to be issued in accordance with Rule 1, it is at least arguable that EPA meant to endorse Rule 1 similarly."  United States' Motion at 7:22-25.  Relatedly, although CBE maintains that there is no evidence EPA knew that construction at CGS had ceased when EPA delegated and re-delegated the expired GGS PSD permit to the BAAQMD, the delegation agreements explicitly state that no operating permit had been issued for the plant, which suggests that EPA knew that the plant was not functioning.

Accordingly, after review of the record and the consent decree, the Court finds that the consent decree is substantively fair and in the public interest.

### C.      CBE's claim against PG&E

CBE argues that if the Court enters the proposed consent decree, the Court should determine that CBE's claims against PG&E are not barred by *res judicata*. According to CBE, the claims that should not be precluded are those for public participation in a permitting process that would address impacts, including species impacts, and for civil penalties, as well as for mitigation allowed to citizens under the Clean Air Act, 42 U.S.C. § 7604(g)(2).  CBE argues that its claims should remain because EPA did not diligently prosecute its claims.  *See Sierra Club v. City and County of Honolulu*, No. 04-00463, 2008 WL 1968317, at*6-8 (D. Haw. May 7, 2008) (holding citizen suit was not barred because government agencies did not diligently prosecute).  CBE's arguments in this regard are the same as its objections to the entry of the consent decree; CBE argues that the United States should have required PG&E to go through the permitting process and that the consent decree's $20,000 civil penalty will not act as a deterrent.

For all of the reasons set forth above, the Court finds that the record does not demonstrate that the United States did not diligently prosecute its claims, and thus the Court finds that CBE's claims will be barred by *res judicata*.

1

## CONCLUSION

2          For the foregoing reasons and for good cause shown, the Court hereby DENIES Wild Equity

3   Institute's motion to intervene and GRANTS the United States' motion to enter the proposed second

4   amended consent decree.  (Docket Nos. 51 and 96).

5

6          **IT IS SO ORDERED.**

7

8   Dated: March 3, 2011                                    _____

9                                                           SUSAN ILLSTON
                                                            United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28